## No. C-919

**Dairyland Insurance Company and Leo D. Miller v. Raymond Joseph Drum and Colorado Farm Bureau Mutual Insurance Company**

(568 P.2d 459)

Decided August 29, 1977.                    Rehearing denied September 19, 1977.

Walberg and Pryor, W. Randolph Barnhart, for petitioners.

DeMoulin, Anderson, Campbell and Laugesen, Laird Campbell, for respondents.

*En Banc.*

MR. JUSTICE GROVES and MR. JUSTICE ERICKSON delivered the opinion of the Court.

We granted certiorari to review the judgment of the Court of Appeals in *Drum v. Dairyland Insurance Co.*, 37 Colo. App. 222, 546 P.2d 1283 (1975). We reverse and remand with directions.

Petitioner Miller's truck became disabled on the highway, and he obtained a tow from respondent Drum. Drum was driving his own vehicle, and Miller was steering his. Drum attempted to make a U-turn, but stopped as he was about to go into a barrow pit, leaving Miller's vehicle in the center of the road. A third vehicle traveling down the highway ran into the Miller truck. The driver and two other occupants of the third vehicle were severely injured.[1]

Miller carried insurance on his vehicle with Dairyland Insurance Company (Dairyland), with limits for personal injury of $15,000 per person and $30,000 per occurrence. Drum was insured by Colorado Farm Bureau Mutual Insurance Company (Farm Bureau), with limits of $50,000 per person and a limitation of $100,000 for any one accident.

The two policies contained similar provisions. Each agreed to pay, on behalf of the "insured," all sums which the insured "shall become legally obligated to pay because of bodily injury . . . caused by accident and arising out of the ownership, maintenance, or use of the automobile." Each policy defined an insured as "any person who is using the automobile." Under the policies, until there is a determination or stipulation that an insured was negligent and liable for the injuries, no judgment can be awarded against either insurer. Each policy provided that, in the event the insured had other insurance against a loss covered by the policy, the company's liability was limited to the proportion of the loss that the applicable limit of liability stated in that policy bore to the total amount of all valid and collectible insurance covering the loss. Each policy also contained an "excess" clause, which provided that if a loss occurred while the insured

---

[1]The collision occurred prior to the effective date of the Colorado Auto Accident Reparations Act (Motor Vehicle — No Fault — Insurance, Sections 10-4-701, *et seq.*, C.R.S. 1973).

was driving a non-owned vehicle, the coverage available under his policy would be limited to excess insurance over any other valid and collectible insurance covering the loss.

A declaratory judgment action was brought, with Miller, Drum, and their insurance companies as parties, to determine the insurance coverage provided by the respective policies. Judgment was entered upon stipulated facts. The district court found that under the terms of the policies, Miller (steering the towed vehicle) was using both his and Drum's towing vehicle; and Drum was using his own vehicle, but not Miller's. The court also found that Miller was insured under both his Dairyland policy and Drum's Farm Bureau policy; but that Drum was only insured under the Farm Bureau Policy. The declaratory judgment held that Farm Bureau provided primary coverage to Drum and Miller and that Dairyland provided only excess coverage for Miller beyond the primary coverage afforded him by Farm Bureau.

Subsequently, Farm Bureau, having given notice to Dairyland, settled claims against Drum in the amount of $61,212.54. There is no dispute as to the propriety of these settlements.

## I.

Respondents appealed to the Court of Appeals. That court upheld the district court's finding that Miller was "using" both vehicles and that Drum was "using" only his own. We reverse and hold that, while he was towing Miller's truck, Drum was a "person . . . using the vehicle" and came within the ambit of coverage provided by the Dairyland policy.

Although this court has previously interpreted similar "use" provisions in automobile insurance policies, we have not previously considered the question now before us. *See Mason v. Celina Mutual Insurance Co.,* 161 Colo. 442, 423 P.2d 24 (1967). Courts in other jurisdictions have been presented with similar factual situations, and we turn to their decisions for guidance.

In *American Fire and Casualty Co. v. Allstate Insurance Co.,* 214 F.2d 523 (4th Cir. 1954), Kramer was using a Chrysler automobile to tow a jeep. He owned both vehicles. Kramer swerved across the centerline of the highway and collided with an oncoming vehicle, resulting in injuries. Allstate, which insured the Chrysler, settled the claims and sought contribution from American Fire and Casualty, which insured the jeep. American Fire and Casualty denied liability on the ground that the personal injuries had not arisen from Kramer's "use" of the jeep. The court rejected this argument, holding that:

"The jeep was moving on the road by means of its own running gear and although it was not employing its own power unit, it was subject to the vicissitudes and dangers of travel on the public highway and was being propelled under circumstances not infrequently encountered. It cannot be said that the employment of the vehicle in such a manner was so unusual as not

to have been within the contemplation of the parties to the insurance contract. . . ." *Id.* at 525.

In *Howard v. Ponthieux*, 326 So.2d 911 (La. App. 1976), a pickup truck broke loose from the truck which was towing it and collided with traffic in the opposing lane. The court held that the driver of the tow truck was "using" the pickup truck for the purpose of qualifying him as an insured under the pickup truck's liability policy. That court quoted 7 Am. Jur.2d, *Automobile Insurance* § 110:

"The term 'use' . . . is not limited to those actually operating or driving the motor vehicle but extends to those who have such a right over the vehicle as to impose a legal responsibility upon them for the use of the vehicle."

In *Baudin v. Traders & General Insurance Co.*, 201 So.2d 379 (La. App. 1967), the court made an extensive review of prior case law and found that the following tests had been applied to determine use:

"(1) The dangerous situation causing injury must have its source in the use of the automobile; (2) The chain of events resulting in the accident must originate in the use of the automobile and be unbroken by the intervention of any event which has no direct or substantial relation to the use of the vehicle; (3) The accident must be a natural and reasonable incident or consequence of the use of the vehicle for the purposes contemplated by the policy, although not necessarily foreseen or expected; (4) The accident must be one which can be 'immediately identified' with the use of the automobile as contemplated by the parties to the policy; (5) The accident must be of a type reasonably associated with the use of the automobile as contemplated by the contracting parties; (6) The accident must be one which would not have happened 'but for' the use of the automobile."

Although we express no opinion as to the result reached by the court in *Baudin*, we are in general agreement with the reasoning it used to arrive at its decision. *Accord, Industrial Indemnity Co. v. Continental Casualty Co.*, 375 F.2d 183 (10th Cir. 1967); *St. Paul Fire and Marine Ins. Co. v. Hartford Accident and Indemnity Co.*, 244 Cal.App.2d 826, 53 Cal.Rptr. 650 (1966); *Esfeld Trucking, Inc. v. Metropolitan Insurance Co.*, 193 Kan. 7, 392 P.2d 107 (1964) (Robb, J. dissenting); *Wiebel v. American Farmers Mutual Insurance Co.*, 1 Storey 151, 140 A.2d 712 (Del. Super. 1958).

There is a common principle in these decisions which can be applied to Drum's actions in this case. Each of the above cases found a "use" in insurance policy terms where the vehicle was dealt with in a manner that created or had the potential of creating an unreasonably dangerous situation. When Drum towed Miller's vehicle, he assumed the responsibility of doing so in a safe and reasonable manner. Accidents arising from towing situations are neither rare nor unforeseeable. It is obvious that Drum's actions in towing the Miller vehicle carried the potential of

creating an unreasonable risk of injury. That potential arose as much from Drum's use of Miller's vehicle as from the use of his own. We, therefore, hold that both vehicles were being used by both Miller and Drum.

This conclusion results in the following insurance coverage:

*Dairyland*:

(a) Miller's use of his own truck — primary.

(b) Miller's use of Drum's truck — primary subject to excess insurance clause.

(c) Drum's use of Miller's truck — primary.

*Farm Bureau*:

(d) Drum's use of his own truck — primary.

(e) Drum's use of Miller's truck — primary subject to excess insurance clause.

(f) Miller's use of Drum's truck — primary.

## II.

The remaining issue to be resolved concerns the manner of apportioning any potential loss between the two insurers if liability should be found to exist. We cannot apportion the settlement entered into by Farm Bureau, since there exists neither a stipulation as to negligence nor a finding of negligence by any court on the part of either Miller or Drum.

The Court of Appeals applied the minority rule under which apportionment is done on an equal basis up to the insurer's respective policy limits. Under the majority rule, apportionment of the total coverage is done on the basis of a ratio of policy limits. *St. Paul Mercury Insurance Co. v. Underwriters at Lloyds of London*, 365 F.2d 659 (10th Cir. 1966), and *Annot.* 69 A.L.R.2d 1122.

We need not decide in this case which rule applies in Colorado, since both insurance policies provide for apportionment under the majority approach. The Dairyland policy is illustrative and reads:

"[I]f the insured has other insurance against a loss to which coverages A and B apply, the Company shall not be liable under coverages A and B for a greater proportion of such loss than the applicable limit of liability under this or any other policy issued to the named insured bears to the total applicable limit of liability of all valid and collectible insurance against such loss. . . ."

These clauses were no doubt drafted by the insurance companies with the goal of limiting liability if apportionment should prove necessary. The fact that the insurer with the lower policy limits will always benefit from such clauses is insufficient to deny their application. When both insurers contractually designate the same method of apportionment, the contracts will be given effect. *Denton v. Prudential*, 100 Colo. 293, 67 P.2d 77 (1937). *See also Farmer's Insurance Exchange v. Fidelity and Casualty Co. of New York*, 374 P.2d 754 (Wyo. 1962); *Clow v. National Indemnity Co.*, 54 Wash.2d 198, 339 P.2d 82 (1959); *Consolidated Shippers v.*

*Pacific Employer's Insurance Co.*, 45 Cal. App.2d 288, 114 P.2d 34 (1941).

Accordingly, we reverse and return to the Court of Appeals for remand to the trial court with directions for entry of a declaratory judgment as to use, as set forth in this opinion, and for any further proceedings not inconsistent with the directions contained herein.

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE CARRIGAN dissent as to Part II of the Opinion.

MR. JUSTICE CARRIGAN, concurring in part and dissenting in part:

I respectfully concur in part and dissent in part.

While concurring in all other aspects of the majority opinion, I respectfully dissent from the majority's decision as to the last issue considered, the method of apportioning the loss between the two companies. The Court here applies what it characterizes as the "majority rule," but reaches the result through interpreting provisions of the two policies rather than by settling the underlying legal issues involved.

In my view the policy provisions invoked do not govern and the Court should resolve the primary issue argued by the parties by adopting the "50-50 proration" rule followed by the Court of Appeals.

The policy provisions relied on by this Court govern contractual relations between each insurer and its respective insured, not contractual relations between the two insurance companies. Thus, although these provisions may place a ceiling on the amount for which each company may be liable to indemnify its own insured, they cannot bind a different insurance company with which there has been no negotiation of terms and from which no consideration has been received. In short there is no evidence of a contract between the two insurers regarding the proportion of the loss to be borne by each. Of course they are free to enter such a contract. But, absent any contractual arrangement, apportionment of the loss should be governed by law. The effect of the Court's opinion is to force upon two insurance companies a contract they did not negotiate and whose terms they did not agree to accept.

The injustice of our thus forcing contracts upon insurance companies may be illustrated by a simple example. Assume that *X* Company's business consists primarily of writing high limit coverage, typically at least $100,000 - $300,000 liability limits. Assume further that *Y* Company specializes in writing high risk, low limits coverage and never writes policies for more than the $15,000 per person - $30,000 per accident - minimum coverage required by law. In every accident jointly caused by an *X* Company insured and a *Y* Company insured the rule today adopted places a disproportionately high share of the loss on *X* Company. This is true even

though it is likely that the high risk drivers insured by $Y$ Company will be more at fault in causing the losses than the standard risk drivers insured by $X$ Company. It seems highly unlikely that $X$ Company would voluntarily enter into an agreement with $Y$ Company to apportion joint losses according to respective coverage limits, for $Y$ Company would always have minimum limits. Such a contract would be a "no win" proposition for $X$ Company.

Insurers should be free to enter into *or* decline such contracts with other insurers without interference by this Court. Certainly we should not impose upon insurance companies a contract which potentially could be so grossly unfair to one of the companies.

Given the need to choose a rule for apportioning losses, I would affirm the choice made by the Court of Appeals as the rule most likely to achieve justice in most cases. This rule would require each company to contribute equally until the limits of the smaller policy were exhausted. Any unpaid portion of the loss would then be paid from the larger policy to the extent of its limits. In cases where the loss is less than either policy limit the loss would be borne on a 50-50 basis. Likewise, where the loss is no greater than twice the coverage provided in the smaller policy, the loss would be shared equally. Where the negligence of two drivers contributes to bring about a loss, there is no rational reason to assume that it is fair to apportion more of the loss to the person having more insurance coverage. Such a rule penalizes the more prudent, responsible driver who provides greater coverage than required by law and rewards the driver, often the high risk driver with a bad driving record, who purchases only the minimum coverage required.

The injustice is most apparent when the losses are high. For example, assume that $P$ is seriously injured through the negligent driving of $X$ and $Y$, each in a separate car. Assume that $X$ and $Y$ were equally at fault. Assume $X$ has \$15,000 coverage and $Y$ has \$300,000 coverage. The loss is \$21,000. If the so-called "majority" rules applies, $X$'s company will pay 15/315 or 1/21 of the loss: \$1,000. $Y$'s company will pay 20/21 or \$20,000. Under the rule chosen by Judge Coyte's opinion for the Court of Appeals, the rule I would adopt, each company would pay \$10,500.

The inequity of the so-called "majority" view becomes more apparent as the coverage purchased by the more responsible insured increases. When applied to persons who have prudently provided "umbrella coverage" with the common limits of \$1,000,000 or \$5,000,000, the rule adopted by this Court today produces results that are atrocious.

While companies selling low coverage policies to high risk drivers perform a valuable and socially useful function, there is no reason to subsidize them at the expense of more careful drivers who buy higher coverage. Ideally each insurer should bear the portion of the total loss caused by its insured. Absent a rule requiring that, however, the rule adopted by the

526

Court of Appeals is the more just alternative.

I am authorized to state that MR. CHIEF JUSTICE PRINGLE joins me in this dissent.