764 P.2d 1191 (1988)
EMPIRE CASUALTY COMPANY, a Corporation, Petitioner,
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a corporation, Chicago Insurance Company, a corporation, and Continental Casualty Company, Respondents.
CHICAGO INSURANCE COMPANY, a corporation, Petitioner,
v.
CONTINENTAL CASUALTY COMPANY, Respondent.
Nos. 85SC362, 85SC380.
Supreme Court of Colorado, En Banc.
November 28, 1988.
Rehearings Denied December 19, 1988.
*1192 William DeMoulin, Donald E. Cordova, Larry N. Harris, Cordova, DeMoulin, Harris & Mellon, P.C., Denver, for Empire Cas. Co.
Arthur H. Downey, Kenneth G. Gulley, Downey & Gulley, P.C., Denver, for Chicago Ins. Co.
Thomas L. Roberts, John L. Wheeler, Pryor, Carney and Johnson, P.C., Englewood, for Continental Cas. Co.
MULLARKEY, Justice.
This case involves a dispute among three insurance companies regarding the share each must pay of a $575,000 medical malpractice judgment entered against a physician insured by the three companies. The trial court found multiple acts of negligence by the physician and held that each insurance policy in effect at the time the physician committed any negligent act was responsible for the entire amount of the verdict up to the amount of the policy limit. The court found that the Empire Casualty Company (Empire) had two policies in effect when the negligent acts were committed; that each policy had a limit of $100,000; and that, since both the physician and his professional corporation were insured under each policy, two separate limits of $100,000 applied. Accordingly, the trial court entered judgment against Empire for $200,000 on each policy, or a total of $400,000. The trial court apportioned the balance of the medical malpractice judgment equally between the two excess carriers, Continental Casualty Company (Continental) and Chicago Insurance Company (Chicago). *1193 Thus, judgment was entered against Continental for $87,500 and against Chicago for $87,500.
On appeal, the court of appeals affirmed the $400,000 award against Empire, vacated the entire award against Continental, and ordered the trial court to enter judgment against Chicago for $175,000. Continental Casualty Co. v. Empire Casualty Co., 713 P.2d 384 (Colo.Ct.App.1985). We granted certiorari to consider the following questions: (1) whether a legally cognizable cause of action exists in Colorado for the tort of "wrongful life;" (2) whether the doctrine of continuing negligence should be applied to the facts of this case; (3) whether, as a matter of law, the Continental Casualty Company waived the threshold limit on its umbrella insurance policy; and (4) whether the court of appeals erroneously failed to conclude that a portion of the malpractice judgment exceeded Continental's threshold limit of coverage even if Continental did not waive that limit.
We now affirm in part and reverse in part the judgment of the court of appeals.

I.
The $575,000 medical malpractice judgment at issue in this case is the result of a suit brought by Randy and Shelly Peek, on behalf of their minor son, Gary Peter Peek (Pete) against Gerald M. Lockwood, M.D. (Lockwood), a physician specializing in obstetrics and gynecology.[1] Pete was severely injured by a hemolytic disease called erythroblastosis fetalis (EBF) which caused him to become mentally retarded and physically handicapped. Although there are other causes of EBF, the most common cause, and the one present in this case, occurs when a woman, whose blood is RH-negative and who has become sensitized to the D antigen which is present in RH-positive blood, bears a child who is RH-positive. An RH-negative woman may be sensitized by a transfusion of RH-positive blood or by RH-positive fetal blood entering her circulatory system during pregnancy or delivery. A sensitized RH-negative woman's blood contains antibodies which, during pregnancy, cross the placenta into the RH-positive fetus and attack the fetal blood causing anemia. About fifteen percent of fetuses with EBF die before birth, usually after twenty-eight weeks of gestation. R. Phibbs, Hemolytic Disease of the Newborn (Erythroblastosis Fetalis), Pediatrics 1029-30 (A. Rudolph & J. Hoffman eds., 18th ed. 1987). Sensitization of an RH-negative woman, however, ordinarily can be prevented if she is treated with the drug RhoGAM after each birth of an RH-positive child. RhoGAM became commercially available in 1968 and was hailed as a miracle drug because it effectively eliminated the risk of EBF in the children of an RH-negative mother and RH-positive father.
Shelly Peek, Pete's mother, is an RH-negative woman and Randy Peek, Shelly's husband and the father of their children, is RH-positive homozygous. The RH-positive group includes RH-positive homozygous and RH-positive heterozygous. All of the children of an RH-negative mother and an RH-positive homozygous father will be RH-positive. If the father is RH-positive heterozygous, one-half of his children will be RH-positive. Id. at 1029.
The Peeks' first child, Billy, was born on December 22, 1972. Shelly Peek was treated by Lockwood from the early stages of her pregnancy through the delivery. In July or August 1972 Lockwood typed her blood and either mistyped or misrecorded it as RH-positive when, in fact, her blood was RH-negative. This first pregnancy was uneventful and Billy was born a normal, healthy RH-positive baby. Lockwood did not retype Shelly Peek's blood at any time during her first pregnancy and he did not administer RhoGAM to her after Billy was born.
Lockwood also treated Shelly Peek during her second pregnancy in 1974. He did *1194 not retype her blood during the second pregnancy and the Peeks' second son, Justin, was stillborn on October 16, 1974. Prior to receiving the autopsy report on Justin, Lockwood affirmatively advised Shelly Peek that she and her husband could have more children. The autopsy was inconclusive as to the cause of death and Lockwood did not order a blood test of the stillborn baby's umbilical cord or otherwise further investigate the cause of death.
When Shelly Peek became pregnant for a third time, she sought the care of a different physician who typed her blood and discovered that she was RH-negative. Subsequent tests determined that Shelly Peek's fetus had developed a severe case of EBF and attempts were made to treat the disease by giving intrauterine transfusions. Finally, however, the treating physicians decided to deliver the baby prematurely to avoid its certain death if the pregnancy continued. On April 25, 1976, Pete was delivered at about thirty to thirty-one weeks of gestation. He suffered severe mental and physical injuries because of EBF.
The advisory jury to the trial court found that Shelly Peek became sensitized immediately after the birth of her first son on December 22, 1972. The jury also found that Lockwood committed four separate acts of negligence during the twenty-seven month period (July 1972 to October 1974) when he treated Shelly Peek for her first two pregnancies. It also found that each act of negligence was a proximate cause of the injuries sustained by Pete. The negligent acts were: (1) mistyping or misrecording of the blood typing of Shelly Peek in July or August of 1972; (2) failing to retype Shelly Peek's blood for RH factor during her second pregnancy and before she was confined for delivery; (3) failing to investigate adequately the cause of the death of Justin Peek including, but not limited to, cord blood tests or retyping the blood of Shelly Peek; and (4) affirmatively advising Shelly Peek to have additional children, without determining or knowing further information regarding the cause of Justin Peek's death. The trial court generally adopted the findings of the advisory jury, with some modifications.
Empire provided Lockwood with his primary malpractice insurance; two of its policies were in effect during the times when Lockwood's negligent acts occurred. Each policy provided coverage of $100,000 per claim and $300,000 aggregate ($100/$300). The first Empire policy was in place in 1972 when Lockwood incorrectly typed or erroneously recorded Shelly Peek's RH blood factor. An Empire policy also was in effect in 1974 when the other three acts of negligence found by the jury occurred. Continental provided excess insurance coverage to Lockwood for a three-year term beginning on April 21, 1970. That policy required that underlying limits of $500/$500 be maintained and provided $1,000,000 of coverage in excess of the underlying limits. Only the first negligent act occurred during the term of this policy. The third insurer, Chicago, had an excess policy in effect for Lockwood from April 21, 1974, to April 21, 1977. Under that policy, Lockwood was required to maintain underlying limits of $100/$300 and Chicago provided him $1,000,000 coverage in excess of the underlying limits. The stillbirth of Justin occurred during the time when Chicago's policy was in effect and the last two negligent acts found by the jury occurred during the term of this policy.[2]
The trial court rejected the arguments of Empire and Chicago that the mistyping or misrecording of Shelly Peek's blood type was the only proximate cause of the injury sustained by Pete and that an apportionment of the damage award based upon any of Lockwood's subsequent acts of negligence could only be accomplished by recognizing a claim for wrongful life.[3] The trial *1195 court also ruled that the doctrine of continuing negligence was inapplicable to this case, and implicitly held that Continental had waived the threshold limit of its umbrella insurance policy.
The court of appeals agreed with Empire and Chicago that allocating the damage award based upon Lockwood's subsequent acts of negligence was tantamount to allowing recovery for wrongful life. The court, however, recognized this claim for relief. 713 P.2d at 391-94. The court further ruled that, as a matter of law, Continental could not waive the threshold limit on its umbrella insurance policy and it reallocated the damage award accordingly. 713 P.2d at 390-91. The court did not discuss the continuing negligence issue, but held that all other contentions of error were without merit. 713 P.2d at 394.

II.
Empire and Chicago argue that the court of appeals erred in recognizing a claim for wrongful life. In another case decided today, this court rejects the tort of wrongful life and expressly overrules the court of appeals' recognition of that tort in this case. See Lininger v. Eisenbaum, 764 P.2d 1202, 1210 n. 10 (Colo.1988). Lininger, however, is not dispositive of the case now before us because we agree with the trial court that this is not a wrongful life case.
In the usual wrongful life case, the defendant's negligence does not create the impaired condition, but it is a cause of the child's birth. E.g., Note, Wrongful Life: Exploring the Development of a New Tort, 21 New Eng. L. Rev. 635, 638 (1985-86); Procanik v. Cillo, 97 N.J. 339, 478 A.2d 755, 760 (1984). Obviously, this case does not present the standard factual context of a wrongful life claim; it is undisputed that Lockwood's negligence caused Pete's impaired condition. Pete's condition was not genetically preordained; he would not have suffered EBF if Lockwood had treated his mother competently.
Nevertheless, Empire and Chicago attempt to characterize this controversy as a wrongful life issue by arguing that Shelly Peek was irreversibly sensitized during the pregnancy and birth of her first child, that any negligent acts of Lockwood subsequent to this birth did not cause any additional harm to Pete, that proper medical care after this point only could have entailed advising Shelly Peek of the potential risks to additional children, and that damages may be allocated based upon these subsequent acts only by recognizing a wrongful life cause of action. The practical effect of this argument is that only those policies in effect when the mistyping or misrecording of Shelly Peek's blood occurred would provide coverage. Thus, if the argument prevails, only one of Empire's policies would be implicated and Chicago would escape liability altogether.
We do not agree with this analysis. The advisory jury found that the subsequent negligent acts of Lockwood were proximate causes of the injuries sustained by Pete. Findings by an advisory jury are not binding, and the ultimate responsibility for factfinding remains with the court. Wilson v. Prasse, 463 F.2d 109, 116 (3d Cir. 1972); see, e.g., Armco, Inc. v. Armco Burglar Alarm Co., Inc., 693 F.2d 1155, 1158 (5th Cir.1982); Selfridge v. Leonard-Heffner Mach. Co., 51 Colo. 314, 117 P. 158 (1911). The trial court did not explicitly disapprove of any part of the jury's findings; however, a close analysis of its ruling reveals that the jury findings were not adopted in whole. Specifically, the court did not rely in any manner upon the jury's finding that Lockwood's affirmative advice to Shelly Peek to have additional children was a proximate cause of Pete's injuries. Such a finding might implicate a wrongful life claim because this advice could not have contributed to Pete's injuries in any way except by encouraging the Peeks to have an additional child. The same may be true of the third negligent act found by the jury since a failure to investigate adequately the death of the stillborn child could have injured Pete only by withholding important *1196 information from the Peeks concerning the likelihood of Pete being born disabled.[4]
The trial court did not limit itself to the findings of the advisory jury, however, and ruled that a wrongful life question was not presented because "[t]here was competent evidence produced at trial which indicated that subsequent pregnancies can intensify a mother's RH sensitization, thus causing an increase in the degree of damage due to [EBF] in later children." Therefore, Lockwood's negligence during Shelly Peek's second pregnancy contributed to Pete's injuries and properly may be analyzed as an ordinary prenatal injury tort rather than a wrongful life claim. This holding is supported by the evidence. There was ample medical testimony presented at trial that, following an initial pregnancy and primary sensitization of the mother, subsequent pregnancies can increase both the degree of sensitization and the potential harm to future children.
For example, Dr. Jon Boline, the chairman of the department of pathology at St. Joseph's Hospital in Denver, testified that "[e]ach subsequent exposure to [the D antigen] or each subsequent delivery accelerates the [sensitization] process" with the result that "[e]ach subsequent pregnancy is usually affected more severely than the previous one." There was also medical testimony that, with knowledge that sensitization of the mother has occurred, subsequent pregnancies can be managed to minimize any increased damage to future children. Boline, for example, referred to processes that physicians can perform which may reduce the severity of the sensitization. Delivery by cesarean section may be used as one such process because much of the secondary sensitization of the mother occurs during vaginal delivery of the child. Lockwood himself testified by deposition that, had he known of Shelly Peek's sensitization, he would have referred her to a different physician so that her second pregnancy, that of the stillborn child, could have been managed differently. Thus, the medical evidence presented at trial supports a conclusion that Lockwood's management of Shelly Peek's second pregnancy, from the date of conception to the time of delivery of the stillborn child, enhanced Pete's injuries.
Shelly Peek's second child was conceived on approximately March 22, 1974, and was stillborn on October 16, 1974. The excess insurance policy issued by Chicago went into effect on April 21, 1974. Chicago's policy, therefore, was in effect for all but the first month of this pregnancy. Lockwood's mismanagement of this pregnancy increased Pete's injuries. Thus, Chicago is responsible, as Lockwood's insurer, for these negligent acts without any need to address the question of wrongful life. The same analysis applies to the third of Empire's policies, which was in effect from December 1, 1973 to December 1, 1974, a period which encompasses the entire term of Shelly Peek's second pregnancy. We therefore hold that the court of appeals unnecessarily addressed the question of wrongful life recovery, but that the court correctly affirmed the trial court's holding that apportionment of the damage award should include two of Empire's policies and Chicago's excess policy. See Renslow v. Mennonite Hosp., 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250 (1977) (recognizing a claim for relief where defendants negligently transfused the plaintiff's mother with RH-positive blood, causing sensitization of the mother, nine years prior to the birth of the plaintiff); Siemieniec v. Lutheran Gen. Hosp., 117 Ill.2d 230, 111 Ill. Dec. 302, 309, 512 N.E.2d 691, 698 (1987) (characterizing Renslow as an "ordinary *1197 prenatal-injury case" rather than a wrongful life action).

III.
Empire and Chicago contend that any liability resulting from Lockwood's subsequent negligent acts must be attributed back to his original act of negligence under the doctrine of continuing negligence. Thus, by this reasoning Empire and Chicago would have us reach the same result as that sought by their wrongful life argument, i.e., Empire would be liable only under one policy and Chicago would not be liable.
The doctrine of continuing negligence was developed in medical malpractice cases for purposes of tolling the applicable statute of limitations until the time when medical treatment by the defendant ceased altogether. See, e.g., Johnson v. Winthrop Laboratories Div., 291 Minn. 145, 190 N.W.2d 77 (1971); Fenton v. Danaceau, 220 Va. 1, 255 S.E.2d 349 (1979); 1 D. Louisell & H. Williams, Medical Malpractice ¶ 13.08 (1987); Annotation, When Statute of Limitations Commences to Run Against Malpractice Action Based on Leaving Foreign Substance in Patient's Body, 70 A.L.R.3d 7 § 4 (1976). We adopted the continuing negligence doctrine in Comstock v. Collier, 737 P.2d 845 (Colo. 1987), and applied it procedurally to toll a statute of repose so that it did not begin to run until the end of a continuous course of medical treatment. We have not applied the continuous negligence doctrine in a substantive manner and decline to do so in this case. Nevertheless, we note that the cases relied upon by Empire and Chicago are distinguishable.
In Aetna Casualty & Sur. Co. v. Medical Protective Co., 575 F.Supp. 901 (N.D. Ill.1983), the plaintiff in the underlying action obtained a judgment resulting from her continuous exposure to a drug prescribed by her pediatrician over a period of two years. During this period, the plaintiff obtained treatment for other matters from her pediatrician on several occasions and obtained six refills of the drug in question. The court held that because all prescription refills and all the resulting injuries flowed from the one diagnosis and one course of treatment prescribed, only a single "occurrence" was present. The court further held, however, "[w]here each injury results from an independent cause, there [is] a series of `occurrences.'" 575 F.Supp. at 903. As the trial court in this case correctly found, Pete suffered additional injuries due to the independently negligent acts of Lockwood. These acts occurred over the course of two separate pregnancies, and cannot be characterized as "continuous."
Aetna Life & Casualty Co. v. McCabe, 556 F.Supp. 1342 (E.D.Pa.1983), and Zipkin v. Freeman, 436 S.W.2d 753 (Mo.1968), both involved a doctor's continual abuse of the doctor-patient relationship over a period of years, again much different from the separate acts of negligence performed by Lockwood. Further, in McCabe, the court noted that the jury was not asked to consider separate torts in several years and did not award damages for separate claims in each year. 556 F.Supp. at 1358. Here, the jury and the trial court explicitly found separate acts of negligence which contributed to Pete's injuries.
In any event, we prefer to follow the reasoning of St. Paul Fire & Marine Ins. Co. v. Hawaiian Ins. & Guaranty Co., 2 Hawaii App. 595, 637 P.2d 1146 (1981), where the court held that three instances of negligent administration of an anesthetic gave rise to three claims, for purposes of an insurance policy, because three separate acts of negligence occurred. Similarly, Lockwood's negligent acts implicate all policies in force during the time of those acts.

IV.
Continental's insurance policy provides for $1,000,000 of coverage "in excess of ... the amount recoverable under the underlying insurance as set out in the schedule of the underlying insurance...." The relevant schedule specifies that the underlying limits of liability for professional liability insurance were $500/$500. The policy further provides that "[i]f the insured fails to *1198 maintain the underlying policy of professional liability insurance set out in the schedule, the insurance provided for professional liability by this endorsement shall be suspended and not apply during such period the underlying professional liability policy is not in full force and effect."
It is undisputed that, during the term of the Continental policy, the limits on Lockwood's Empire primary coverage, the underlying professional liability insurance, were reduced below the required amount, $500/$500, to $100/$300. The advisory jury found, however, that Continental had waived its right to assert that its excess policy was suspended due to Lockwood's failure to maintain the required underlying coverage. Relying on this, the trial court concluded that Continental provided Lockwood with $1,000,000 coverage in excess of the $100/$300 limits of the underlying Empire policy. Thus, the trial court implicitly ruled that Continental had waived the right to assert the threshold limits of its excess policy, an entirely separate question from that of policy suspension.
The question of Continental's waiver of its right to assert a suspension of its policy is not before us. We agree with the court of appeals that the trial court's ruling imposing liability upon Continental below the threshold amount provided for in Continental's policy was error.
In Hartford Live Stock Ins. Co. v. Phillips, 150 Colo. 349, 372 P.2d 740 (1962), the trial court held that, by issuing a policy of insurance without a thorough investigation of the condition of the insured property, the defendant insurance company waived a provision denying liability for a preexisting condition. This court reversed the trial court, ruling that:
The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom, and the application of the doctrines in this respect is therefore to be distinguished from the waiver of, or estoppel to assert, grounds of forfeiture. Thus, while an insurer may be estopped by its conduct or its knowledge from insisting upon a forfeiture of a policy, the coverage, or restrictions on the coverage, cannot be extended by the doctrine of waiver or estoppel.
372 P.2d at 742 (quoting 29A Am.Jur. Insurance § 1135).
Phillips is directly applicable and controls this case. Continental may have waived its right to suspend its insurance policy based upon the failure of Lockwood to maintain the required underlying limits. However, this waiver cannot have created liability where none existed under the policy. See Reserve Ins. Co. v. Pisciotta, 30 Cal.3d 800, 180 Cal.Rptr. 628, 640 P.2d 764 (1982) (where excess coverage insurance policy required insured to maintain existing level of primary coverage and insured procured replacement primary coverage of a lesser amount, excess insurer is not liable for damages below original primary coverage). Continental is responsible, therefore, only for its portion of the judgment above $500,000.

V.
Chicago argues that, notwithstanding the disposition of the above issues, the court of appeals erred in imposing payment of the entire excess judgment upon Chicago, and that Continental should pay a portion of this excess judgment. The court of appeals reasoned that, because Empire's total payment of $400,000 represented its coverage under two separate policies for two separate time periods, and that because only one of these policies was in effect while the Continental policy was in force, only $200,000 worth of primary coverage was implicated during the life of the Continental policy. Furthermore, because only $175,000 remained to be paid under the excess insurance policies, the maximum liability insurance payment underlying the Continental policy was $375,000. Therefore, under the court of appeals' analysis, the threshold limit of the Continental policy was not reached. We reject the court of appeals' construction of the Continental policy.
*1199 Because no evidence was presented to apportion Pete's injuries among Lockwood's several negligent acts, the trial court concludedand Continental here concedesthat each insurance company is separately liable for the full amount of the judgment ($575,000) within the limits of its policy or policies. Thus, we must construe Continental's policy to determine the insured's right to recover under it.
We agree with the trial court that Continental provided Lockwood with broad professional liability coverage which was triggered by any one of the three following events:
(1) a negligent act, error or omission which occurred during the policy period which caused the insured an "ultimate net loss"; (2) "following form" coverage, in the sense that if the underlying policy was triggered, then Continental's policy would also provide coverage; and (3) "claims made" coverage; i.e., if a claim was made against the insured during the policy period, for an act of negligence which occurred prior to its inception, the insured would be provided coverage, assuming compliance with certain policy conditions.
Apparently the court of appeals considered this policy as only providing the "following form" coverage and failed to recognize that the policy also came into play if Lockwood suffered an "ultimate net loss" during the policy period.
The Continental policy provided that Continental would "pay on behalf of the [i]nsured all sums which the [i]nsured shall be obligated to pay by reason of the liability imposed upon the [i]nsured by law...." Further, the policy provided that Continental "shall only be liable for the ultimate net loss in excess of ... the amount recoverable under underlying insurance as set out in the [s]chedule of the underlying insurance...." The amount recoverable under underlying insurance as set out in the relevant schedule was $500,000. Lockwood sustained a loss of $575,000 during the term of the Continental policy because one of his negligent acts happened during that time. Had Continental intended to argue that the whole loss did not occur during its policy period, it was incumbent on Continental to introduce evidence to that effect. It did not do so and, we therefore hold that Continental is liable for that portion of the judgment in excess of $500,000.
Empire, as the primary insurer, is liable for $400,000 of the total judgment. Chicago's threshold limit, as an excess insurer, was $100/$300. Therefore, Chicago is liable for its portion of the judgment in excess of $400,000.[5] Chicago is solely liable for the amount of the excess judgment up to $500,000 and the remaining $75,000 must be apportioned between Continental and Chicago.
We note first that both policies contain "other insurance" clauses, which provide, generally, that if the insured is covered for the loss by any other insurance, such other insurance must be exhausted before liability under the policy in question attaches. These clauses are mutually repugnant and, as such, are void. Guaranty Nat'l Ins. Co. v. Ohio Casualty Ins. Co., 40 Colo.App. 494, 580 P.2d 41 (1978), rev'd on other grounds, 197 Colo. 264, 592 P.2d 397 (1979).
When more than one insurance company potentially is liable for the same loss, three different methods have been developed to apportion that loss. The majority approach apportions liability on the basis of a proration in accordance with the proportionate policy limits of the respective insurance policies. E.g., Dairyland Ins. Co. v. Drum, 193 Colo. 519, 568 P.2d 459 (1977); Guaranty Nat'l Ins. Co., 40 Colo.App. 494, 580 P.2d 41; Annotation, Apportionment Of Liability Between Liability Insurers Each Of Whose Policies Provides That It Shall Be "Excess" Insurance, 69 A.L.R.2d 1122 (1960, Supp. 1984 & Supp. 1987). A minority approach apportions liability on an equal basis up to the applicable policy limits. E.g., Drum, 193 Colo. 519, 568 P.2d 459; State Farm Mut. Auto. Ins. Co. v. *1200 Employers Commercial Union Ins. Co., 35 Colo.App. 406, 535 P.2d 266 (1975); Annotation, Apportionment Of Liability Between Liability Insurers Each Of Whose Policies Provides That It Shall Be "Excess" Insurance, 69 A.L.R.2d 1122 (1960, Supp. 1984 & Supp. 1987). A third approach apportions liability according to a proportion based upon the loss which each insurer would sustain without the other. Employers Mut. Casualty Co. v. MFA Mut. Ins. Co., 384 F.2d 111 (10th Cir.1967); State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 301 F.Supp. 1131 (D.Colo. 1969), aff'd, 433 F.2d 311 (10th Cir.1970); Ruan Transp. Corp. v. Truck Rentals, Inc., 278 F.Supp. 692 (D.Colo.1968).
We need not decide which is the better reasoned approach because, given the facts of this case, each method results in an equal apportionment of liability. The majority approach does so because each of the two policies provides $1,000,000 of excess coverage. The minority approach arrives at this result because neither policy limit was reached. The third approach also achieves the same result because, standing alone, each insurance company would be responsible for the remaining $75,000. Chicago and Continental are liable for $37,500 each of the remaining $75,000; therefore, Chicago is liable for $137,500 of the total excess amount, and Continental is liable for $37,500 of that excess amount.
The judgment of the court of appeals is affirmed in part and reversed in part, and the case is returned to that court with directions to remand to the trial court for entry of judgment in accordance with this opinion.
ERICKSON, J., concurs in part and dissents in part, and VOLLACK, J., joins in the concurrence and dissent.
ERICKSON, Justice, concurring in part and dissenting in part:
I respectfully concur in part and dissent in part. In my view the trial court properly analyzed Gary Peter Peek's (Pete) claims along traditional negligence concepts, rather than as "wrongful life" claims. I dissent because the court of appeals properly concluded that the $500,000 threshold necessary to activate Continental's excess insurance policy and trigger its obligation to pay was not met.
In this malpractice action Lockwood admitted liability and the sole issue at trial was the measure of damages. An advisory jury entered a $575,000 judgment against Lockwood in favor of Pete based upon four separate negligent acts. Pete recovered on the total judgment from four insurance companies that provided Lockwood with coverage, and this dispute centers around the allocation of liability among the insurance companies.
The claim for "wrongful life" addressed by the appellate court and the majority was never recognized as a "wrongful life" claim by the trial court. In fact, as raised at this late stage of the proceedings, the issues of "wrongful life" and "continuing negligence" have relevance only insofar as they directly relate to determining the proper allocation of damages among the insurance carriers. It is asserted that if we uphold the trial court's findings that each of Lockwood's four negligent acts was a proximate cause of the injuries sustained by Pete, and allow damages to be apportioned accordingly, then we are impliedly recognizing a claim for "wrongful life." I disagree. Whether Pete has stated a cognizable claim should be analyzed along traditional negligence guidelines. See Lininger v. Eisenbaum, 764 P.2d 1202 (Colo.1988) (Erickson, J., concurring). The advisory jury determined the case on the issue of negligence, and its findings should not be disturbed here.
The advisory jury found that Lockwood had committed four independent acts of negligence: (1) mistyping or misrecording the results of Shelly Peek's (Shelly) blood test in July or August of 1972; (2) failing to retype Shelly Peek's blood for the RH factor during her second pregnancy and before she was confined for delivery; (3) failing to investigate adequately the cause of Shelly's second son's (Justin) stillbirth; and (4) affirmatively advising Shelly Peek to have additional children, without determining the cause of Justin Peek's stillbirth. *1201 The trial court found that "[s]ince the defendants presented no evidence of apportionment with regard to the degree of aggravation caused by the subsequent acts of professional negligence, [Peter] Peek was entitled to recover in full for damages caused by them." (citing Newbury v. Vogel, 151 Colo. 520, 379 P.2d 811 (1963)).[1] I interpret the trial court's findings to mean that each insurance policy in effect at the time the negligent acts occurred is liable for the judgment, subject to the limitations on liability as set out in each policy. Even though the trial court stated that each insurance carrier is potentially liable for the entire $575,000 judgment, any liability is necessarily conditioned upon the express terms of the liability limitations found in each policy. See Mid-Century Ins. Co. v. Liljestrand, 620 P.2d 1064 (Colo.1980); Gulf Ins. Co. v. State, 43 Colo.App. 360, 607 P.2d 1016 (1979).
Three insurance companies are involved in this dispute: Empire Casualty Company (Empire), who underwrote Lockwood's primary malpractice coverage; and Continental Casualty Company (Continental) and Chicago Insurance Company (Chicago), who underwrote Lockwood's excess insurance coverage.[2] The trial court found that Empire had two primary insurance policies in effect when the negligent acts occurred. Policy No. 18168 was in force when the initial mistyping or misrecording of the blood occurred in July or August 1972, and Policy No. 20598 was in effect when the three subsequent negligent acts occurred. Each policy provided $100,000 worth of coverage for Lockwood and $100,000 for his professional corporation, establishing $400,000 worth of primary insurance coverage. At trial, the court entered judgment against Empire for $200,000 on each policy, or for $400,000 in total.
Chicago provided $1,000,000 worth of excess insurance coverage to Lockwood from April 21, 1974 to April 21, 1977. Under the Chicago policy, Lockwood was required to maintain 100/300 of underlying primary coverage.[3] The policy also stated that Chicago would be liable for any amount that Lockwood became liable for during the policy's term which exceeded:
[t]he insured's retained limit defined as an amount equal to the limit(s) of liability indicated beside the underlying professional policy(ies) listed in Schedule A hereof plus the applicable limits of any other underlying insurance collectable by the insured.
(Emphasis added.) By the express terms of the Chicago policy, it is liable for any judgment entered against Lockwood that exceeds the $200,000 underlying limit of Empire's Policy No. 20598, because No. 20598 is the "underlying professional liability policy," plus the $200,000 provided by Empire's Policy No. 18168, because that policy falls within "any other underlying insurance collectable by the insured." Thus, in this case, if Continental is not obligated to provide coverage under its policy, Chicago is solely liable for that amount of the $575,000 judgment in excess of $400,000, or $175,000.
Continental's insurance policy with Lockwood was in effect between April 21, 1970 and April 21, 1973, and provided $1,000,000 worth of excess coverage conditioned upon Lockwood obtaining and maintaining 500/500 worth of primary coverage. Lockwood obtained the requisite primary coverage from Empire. However, when Empire informed Lockwood that it was no longer financially able to underwrite the 500/500 coverage, and could only provide 100/300 coverage, Lockwood agreed to the reduction in coverage and then failed to acquire supplemental primary coverage from another source to meet the 500/500 level required by Continental. The Continental *1202 policy provides that Continental is not obligated to provide coverage until the primary policy limit of $500,000 has been paid. Specifically, the Continental policy provides for $1,000,000 worth of coverage "in excess of... the amount recoverable under the underlying insurance as set out in the schedule of underlying insurance...." That amount as set out in the schedule was $500,000.
The majority concludes that because the judgment was for $575,000, the $500,000 threshold was met and Continental is therefore liable, along with Chicago, for its portion of the judgment in excess of the $500,000. While this conclusion may appear to be reasonable, it ignores the fact that only Empire Policy No. 18168 was in force during the time the Continental policy was in effect. The only negligent act that occurred while Continental provided coverage took place in July or August of 1972, for which Empire had to provide $200,000 worth of coverage pursuant to its policy no. 18168. The $200,000 paid out by Empire pursuant to its policy no. 20598 was attributed by the trial court to negligent acts that occurred after Continental's coverage ended, and as such should not be applied against Continental's $500,000 threshold.
Because the trial court did not apportion liability among the three insurance companies, it cannot be determined with certainty whether the $175,000 of the judgment not covered by Empire's primary insurance coverage was attributable to the first negligent act, which occurred while the Continental policy was in effect, or to the second, third, or fourth negligent acts, which occurred while the Continental policy was not in effect, or to any combination thereof. If the $175,000 were attributable to the first act, then Empire would have been obligated to pay out $375,000 under its primary coverage, if Lockwood had maintained the 500/500 primary coverage required by Continental. Because I agree with the majority's statement that Lockwood's failure to carry the requisite primary coverage does not lower Continental's threshold from 500/500 to 100/300, the $375,000 of primary coverage paid out during the term the Continental policy was in effect falls $125,000 short of the $500,000 threshold necessary to activate the Continental policy. Since Lockwood's failure to maintain the requisite primary insurance coverage does not lower Continental's threshold, and since this $500,000 threshold was never met, the Continental policy was never activated. Accordingly, Continental is not liable to pay any portion of the $575,000 judgment, and that liability falls solely on Chicago.
I am authorized to say that Justice VOLLACK joins in this concurrence and dissent.
NOTES
[1] Shelly and Randy Peek also sued Lockwood on their own behalf and were awarded $61,608.19 in damages. This judgment has been satisfied and is not at issue in the case before us. The $575,000 awarded to Pete also has been paid by the insurance companies which reserved their rights to have each company's share of the judgment apportioned. Continental brought this declaratory judgment action seeking, in effect, apportionment of that judgment.
[2] The second negligent act occurred when a third excess carrier, St. Paul Fire and Marine Insurance Company (St. Paul), was providing excess insurance coverage to Lockwood. The trial court dismissed St. Paul from the case on its motion for summary judgment; that ruling is not before this court.
[3] When referring, throughout this opinion, to Lockwood's subsequent acts of negligence, we mean to include those negligent acts occurring after the initial mistyping or misrecording of Shelly Peek's blood.
[4] Shelly Peek's third pregnancy, which resulted in Pete's birth, appears from the evidence to have been managed as well as medical science allowed. By the time of her third pregnancy, Shelly Peek was under the care of a different doctor who recognized her sensitization early in that pregnancy and pursued all possible measures to minimize injury to Pete. Therefore, discovery of Shelly Peek's sensitization after the stillbirth of her second child probably could not have lessened Pete's injuries given the medical care provided during her pregnancy with Pete. As explained in the text, however, more capable management of her second pregnancy probably would have lessened the damage to Pete.
[5] Although it could be argued that Chicago is liable for that portion of the judgment above $300,000, rather than $400,000, that portion of the trial court's ruling is not before us.
[1] "Subsequent acts of negligence" refers to those three acts that occurred after the results of Shelly Peek's blood test were either misrecorded or mistyped in July or August of 1972.
[2] Only three insurance companies are now involved in the dispute, the fourth company, St. Paul Fire and Marine Insurance Company having been dismissed from the case by the trial court on a motion for summary judgment.
[3] 100/300 refers to $100,000 in coverage per claim and $300,000 in aggregate coverage. 500/500 refers to $500,000 in coverage per claim and $500,000 in aggregate coverage.