2003 ND 50

**GRINNELL MUTUAL REINSURANCE COMPANY, Plaintiff and Appellee,**

v.

**CENTER MUTUAL INSURANCE COMPANY, Defendant and Appellant.**

No. 20020073.

Supreme Court of North Dakota.

March 26, 2003.

Lawrence A. Dopson, Zuger Kirmis & Smith, Bismarck, N.D., for plaintiff and appellee.

Lawrence R. Klemin, Bucklin, Klemin & McBride, Bismarck, N.D., for defendant and appellant.

MARING, Justice.

[¶ 1] Center Mutual Insurance Company ("Center") appealed from a declaratory judgment holding that an automobile insurance policy it issued to Steven R. Haskins provided coverage for injuries suffered by James D. Jones in an accident on Haskins' farm, and ordering Center to indemnify Grinnell Mutual Reinsurance Company ("Grinnell") for a settlement payment made by Grinnell to Jones and for a guaranty of payment made by Grinnell to the United States on Haskins' behalf. We conclude the trial court did not err in ruling Center's automobile insurance policy provided coverage for the accident, but did err in ruling the Grinnell policy did not provide coverage and in ordering Center to fully indemnify Grinnell with interest for the settlement. We also conclude the trial court erred in ordering Center to indemnify Grinnell with interest on its guaranty to the United States. We affirm in part and reverse in part.

I

[¶ 2] During 1990, Haskins owned a farm near Deering. On April 22, 1990, Haskins' friend, Jones, who served in the United States Air Force, was driving in the area and stopped at Haskins' farmstead. Jones spoke with Haskins' wife, who told him she was supposed to help Haskins move an inoperable John Deere tractor the family stored in a field. Jones offered to help Haskins instead. After finding Haskins, Jones "asked him if he needed help moving the tractor and he said yes." They drove in Haskins' 1970 Chevrolet pickup to the field where the tractor was located.

[¶ 3] Haskins took from the pickup toolbox a "light nylon rope" with a hook on one end and a braided loop on the other to hook up and tow the disabled tractor. Haskins wrapped the hooked end of the rope around the tractor axle, hooked the braided loop to the bumper hitch on the back of the pickup, and stuck a pin through the loop and through the bumper hitch. The tractor gear was placed in neutral and Jones steered the tractor while Haskins towed it with the pickup. While Haskins was towing the tractor with the pickup, he accelerated to take some slack out of the rope; the rope stretched, "the pin snapped out," and the rope snapped back striking Jones in the arm, severely injuring him. The trial court found: "The accident was caused by the fact there was no cauter [sic] pin inserted into the hole." Neither Center nor Grinnell disputed this finding on appeal. Jones was taken to the hospital at the Minot Air Force Base where he was hospitalized for 45 days and underwent seven surgeries on his arm.

[¶ 4] At the time of the accident, Haskins' pickup truck was covered by an automobile insurance policy issued by Center. Haskins also had a farm insurance policy issued by Grinnell, covering his farming operation. Haskins first notified Grinnell about the accident and notified Center after the United States requested the insurance policy number for the pickup truck. Center and Grinnell each concluded its policy did not provide coverage for the accident. After Center refused to contribute with Grinnell to a settlement of Jones's claim against Haskins, Grinnell paid Jones $25,000 and obtained a signed release from him on May 22, 1991. The United States also submitted to Center and Grinnell a $17,684 bill for medical services provided for Jones. Both companies refused to pay, and on April 20, 1993, the United States sued Haskins, Center, and Grinnell in federal district court to recover Jones's hospital and medical expenses under the Medical Care Recovery Act, 42 U.S.C. § 2651 et seq. After Center refused to participate with Grinnell in a settlement with the

United States, Grinnell, in a June 10, 1993, letter to the United States, "guarantee[d] that the air force lien will be paid in full ... to facilitate a determination of the issue of priority of coverage without the need to become involved in expensive litigation in the U.S. District Court action you have commenced."

[¶ 5] In August 1993, Grinnell began this declaratory judgment action against Center to resolve the insurance coverage dispute and to be reimbursed by Center. Depositions of Jones and Haskins were taken in May 1994. Although no formal guaranty agreement was executed by Grinnell and the United States, the federal district court action was dismissed with prejudice upon the United States' motion on October 7, 1994.

[¶ 6] The declaratory judgment action sat idle until Grinnell, represented by different counsel, moved for summary judgment against Center on July 31, 2001. Center responded with its own motion for summary judgment. The trial court granted Grinnell's motion, concluding Center's automobile policy rather than Grinnell's farm policy provided coverage for the 1990 accident, and Grinnell was entitled to reimbursement for the $25,000 it paid to Jones, plus six percent interest from the date of payment, and for the $17,684 Grinnell guaranteed to pay to the United States, plus six percent interest from the date of the guaranty.

[¶ 7] The trial court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 27–05–06, 32–23–02, and 32–23–06. Center's appeal was timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, § 2, and N.D.C.C. §§ 27–02–04 and 28–27–01.

II

[¶ 8] Center argues the trial court erred in ruling its personal automobile in-surance policy, rather than Grinnell's farm insurance policy, provided coverage for Jones's injuries.

[¶ 9] Summary judgment is a procedure for the prompt and expeditious disposition of a controversy without trial if either party is entitled to judgment as a matter of law, if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving factual disputes would not alter the result. *Luallin v. Koehler*, 2002 ND 80, ¶ 7, 644 N.W.2d 591. Factual issues become appropriate for summary judgment when reasonable minds can draw but one conclusion from the evidence. *Jones v. Barnett*, 2000 ND 207, ¶ 4, 619 N.W.2d 490. Summary judgment is appropriate if the only issues to be resolved are questions of law. *Rask v. Nodak Mut. Ins. Co.*, 2001 ND 94, ¶ 10, 626 N.W.2d 693. Interpretation of an insurance policy is a question of law, which is fully reviewable on appeal. *Fortis Benefits Ins. Co. v. Hauer*, 2001 ND 186, ¶ 11, 636 N.W.2d 200.

[¶ 10] We review a trial court's interpretation of an insurance policy by independently examining and construing the policy. *DeCoteau v. Nodak Mut. Ins. Co.*, 2000 ND 3, ¶ 19, 603 N.W.2d 906. We summarized our standards for construing an insurance policy in *Ziegelmann v. TMG Life Ins. Co.*, 2000 ND 55, ¶ 6, 607 N.W.2d 898 (citations omitted):

Our goal when interpreting insurance policies, as when construing other contracts, is to give effect to the mutual intention of the parties as it existed at the time of contracting. We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. "If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the con-

tract." While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.

Exclusions from coverage in an insurance policy must be clear and explicit and are strictly construed against the insurer. *Western Nat'l Mut. Ins. Co. v. University of North Dakota*, 2002 ND 63, ¶ 7, 643 N.W.2d 4.

## A

[¶ 11] Center's "Personal Auto Policy" provided liability coverage "for 'bodily injury' or 'property damage' for which any 'insured' becomes legally responsible because of an auto accident." Center argues its policy does not provide coverage in this case because the incident resulting in Jones's injuries was not an "auto accident," but was a farm accident for which there is no coverage under the policy.

[¶ 12] In *Norgaard v. Nodak Mut. Ins. Co.*, 201 N.W.2d 871, 874 (N.D.1972), this Court adopted the causal connection test for determining whether an automobile insurance company was liable under its policy for coverage for an accidental injury suffered as a "result of the ownership, maintenance or use of the automobile described herein." The insured used the roof of his vehicle as a gun rest and accidentally shot and killed a companion as the companion was alighting from the vehicle. Relying on court decisions interpreting the phrase, "arising out of," contained in insurance policies, this Court said, "the causal relationship need not constitute a proximate cause, but on the other hand if an injury is directly caused by some independent or intervening cause it does not arise out of the use of an automobile, notwithstanding there may have been some remote connection between the use of an automobile and the injury complained of." *Id.* at 875. This Court ruled, " 'use', to result in liability on the part of the insurance carrier, must be such use as arises out of the inherent nature of the automobile." *Id.* at 874. This Court held the causal connection test was not satisfied in that case because "the automobile was being used merely as a bench rest for the rifle," which was not a "use" arising out of the inherent nature of the automobile. *Id.*

[¶ 13] Since *Norgaard*, this Court has applied the causal connection test several times. In *Houser v. Gilbert*, 389 N.W.2d 626, 627 (N.D.1986), the insureds, while trucking sugarbeets, deposited mud and dirt on the highway, which later became slippery after a rain, causing a driver to lose control of his truck and strike another truck. The vehicle insurers argued their policies did not apply because the trucks involved were not being used for transportation purposes at the time of the accident and, therefore, the loss was not caused by the use of a motor vehicle. This Court concluded a causal connection was present because "it is obvious here that the mud could not have been deposited on the roadway without use of the trucks." *Id.* at 628. In *Transamerica v. Farmers Ins. Exch.*, 463 N.W.2d 641, 642 (N.D.1990), this Court determined the causal connection test was satisfied under an automobile policy when a dog owned by the insured bit a pedestrian while the dog waited for the insured in the box of a pickup truck. The Court reasoned, "[c]arrying household pets is a common use of family vehicles" and the

dog "would not have been close enough to the public sidewalk to bite a pedestrian in the face without use of the pickup to haul the dog and to hold the dog while waiting." *Id.* at 643. In *Milbank Mut. Ins. Co. v. Dairyland Ins. Co.*, 373 N.W.2d 888, 890 (N.D.1985), the insurer's automobile policy issued to a farmer, similar to the policy in this case, promised to pay damages for bodily injury for which the law held him responsible because of a "car accident." The insured was unloading bales of hay from his truck when the top bale fell off the side of the truck and struck an individual, injuring him. This Court concluded a causal connection had been established as a matter of law because "unloading bales from the truck" was a "use" which "arose out of the inherent nature of the truck." *Id.* at 893.

■ [¶ 14] These cases demonstrate the causal connection test is broad and comprehensive in scope. Here, Center's policy, similar to the policy in *Milbank Mut. Ins. Co.*, provided liability coverage for bodily injury for which Haskins becomes legally responsible "because of an auto accident." Haskins' pickup was routinely used for towing items, its bumper was designed to be used for towing, and a tow rope was stored in the pickup's tool box. The tow rope was attached to the pickup's bumper and to the tractor. Haskins was driving the pickup and towing the tractor when the rope snapped back and hit Jones. We are not persuaded by Center's argument that there is no causal connection in this case and the accident resulted from an intervening cause because the tractor was no longer being towed by the pickup after the rope became unhooked and it was Haskins' negligence in hooking up the rope rather than his driving that caused the accident. The "causal relationship need not constitute a proximate cause," *Norgaard,* 201 N.W.2d at

875, and Jones's injury cannot be considered wholly disassociated from the use of the pickup. Under this Court's previous applications of the causal connection test, we conclude the accident arose out of the inherent use of the pickup and the causal connection test has been satisfied as a matter of law.

## B

■ [¶ 15] Moreover, Jones was himself an insured under the "Medical Payments Coverage" section of Center's policy. That section of the policy obligated Center to "pay reasonable expenses incurred for necessary medical and funeral services because of 'bodily injury' ... [s]ustained by an 'insured.' " An "[i]nsured" for purposes of this section is defined to mean "[a]ny other person while 'occupying' 'your covered auto.' " "Occupying" was defined to mean "in, upon, getting in, on, out or off," and "[y]our covered auto" was defined as "[a]ny 'trailer' you own." A "[t]railer" was defined as including "a farm wagon or farm implement while towed by a vehicle listed" in the policy. In this case, Jones was occupying a farm implement while being towed by a listed vehicle. Center does not contend the farm tractor was not a "farm implement" as the term is used in the policy. *See Utah Farm Bureau v. Orville Andrews & Sons,* 665 P.2d 1308, 1310 (Utah 1983) (a feeder truck is a "farm implement" as a matter of law); *compare Walle Mut. Ins. Co. v. Sweeney,* 419 N.W.2d 176, 181 (N.D.1988) (a pickup truck may be construed as a "farm implement"); *Heitkamp v. Milbank Mut. Ins. Co.,* 383 N.W.2d 834, 836–37 (N.D.1986) (same). Center's argument that the tractor was no longer being towed when the rope became disengaged and was therefore not a "trailer" within the meaning of the policy is without merit.

### C

[¶ 16] Center argues an exclusion to its liability policy for " 'bodily injury' to an employee of that person during the course of employment" applies in this case because Jones was a gratuitous employee of Haskins. In *Milbank Mut. Ins. Co.*, 373 N.W.2d at 893 (footnote omitted), this Court summarized the law on gratuitous employees:

> In *Olson v. Kem Temple, Ancient Arabic Order of the Mystic Shrine*, 77 N.D. 365, 43 N.W.2d 385 (1950), this Court held that a person who performs services without consideration at the request of another is a gratuitous employee and that Section 34–02–04, N.D.C.C., applies to gratuitous employees. In *Severinson v. Nerby*, 105 N.W.2d 252, 256–257 (N.D.1960), this Court elaborated on the distinction between a gratuitous employee and a volunteer:
>
> > "A 'volunteer' is one who does, or who on his own initiative undertakes to do, something which he is not legally or morally obligated to do and which is not in pursuance or protection of his own personal interests. A volunteer comes under the rule that one who volunteers to act for another cannot recover for personal injuries as a servant of such other."
>
> The North Dakota cases establish that in order for a person to be a gratuitous employee, the "employer" must have expressly or impliedly requested the employee's help. See *Olson v. Kem Temple, Arabic Order of the Mystic Shrine*, supra; *Jacobs v. Bever*, 79 N.D. 168, 55 N.W.2d 512 (1952); *Severinson v. Nerby*, supra; *Anderson v. Meide*, 129 N.W.2d 275 (N.D.1964); *Schan v. Howard Sober, Inc.*, 216 N.W.2d 793 (N.D. 1974).

[¶ 17] In this case, there is no evidence that Haskins either expressly or impliedly requested Jones's help in towing the tractor. Jones testified that after Haskins' wife told him she was supposed to help Haskins move the tractor, he told her: "Wait. I'm just driving around. I'll go help him." Jones testified, upon locating Haskins, "I just asked him if he needed help moving the tractor and he said yes." Jones also testified: "Well, I said, 'I understand you need help moving a tractor,' and he said, 'Well, yeah. Charlene's supposed to come and do it.' And I said, 'Well, I talked to Charlene and I told her I'd come help you,' and he said okay." Haskins testified Jones "pulled over and stopped me and said, 'I hear you want to pull this tractor out of the field,' and then I said—well, I accepted his offer." Reasonable minds could only conclude from this evidence that Jones was a volunteer rather than a gratuitous employee.

### D

[¶ 18] Center argues the trial court at least should have apportioned liability between Grinnell and Center under the principles stated in *Transamerica*, 463 N.W.2d at 643, and *Houser*, 389 N.W.2d at 631, which allowed allocation of losses for the same casualty between separate policies of one insured. Allocation of losses is allowed only when coverage is determined to exist under more than one policy. See *Transamerica*, 463 N.W.2d at 643; *Houser*, 389 N.W.2d at 630.

[¶ 19] The Grinnell Farm–Guard Policy provides:

LIABILITY TO PUBLIC—COVERAGE A

We will pay subject to the liability limits and the terms of the policy all sums arising out of any one loss which an insured person becomes legally obligated to pay as damages because of bodily

injury or property damage covered by this policy.

Under the definitions section of the policy "farm implement" means "a vehicle principally designed for use off the public roads and for agricultural purposes, and which is used in the conduct of agricultural operations." The tractor being towed in this case is clearly a "farm implement" under the "definitions" of the policy. "Farming" is defined as meaning "the ownership, maintenance or use of premises for the production of crops or the raising or care of livestock, including all necessary operations." A tractor is a farm implement used in the production of crops, and certainly it is foreseeable that it will require maintenance and towing. Grinnell states in its amended complaint: "The Grinnell Mutual policy provided general liability coverage to its insured, Haskins, for any liability claim arising as a result of the use of the insured farm premises...."

[¶ 20] The Grinnell policy does include an exclusion:

1. We will not pay for bodily injury or property damage arising out of the ownership, operation, maintenance, rental or use of:

(a) ...

(b) any motor vehicle by any insured person.

The policy defines *"Motor vehicle"* as:

(a) a motorized land vehicle designed for travel on public roads or subject to motor vehicle registration, *except a farm implement;*

...

(d) any vehicle, *except a farm implement,* while being towed or carried on a vehicle included in (a), (b) or (c) above.

(Emphasis added.) The language of the policy is unambiguous. It does exclude liability arising out of the use of the pickup. However, it is equally as clear that it does not exclude liability arising out of "the ownership, operation, maintenance, rental or use of" a farm implement. The next logical question is whether the insured, Haskins, was using a farm implement, the tractor, at the time of the accident. Liability arising out of the use of a farm implement in the context of this case is a covered risk. Haskins was "using" the tractor within the meaning of the policy and there is coverage.

[¶ 21] 8 Lee R. Russ, *Couch on Insurance* § 119.56 (3d ed.1997) states: "The towing of a motor vehicle is a 'use' of that vehicle." Several courts have held that towing a vehicle is using that vehicle. The United States Court of Appeals for the Fourth Circuit held in *State Farm Fire and Cas. Co. v. Pinson,* 984 F.2d 610 (4th Cir.1993), that a boat being towed behind a pickup truck was in use when the truck and boat were struck by a third vehicle in an intersection. The court concluded there was coverage under the owner's boat policy. It also concluded there was a causal connection between the boat's use and the injuries.

[¶ 22] The Supreme Court of Colorado has also addressed whether the driver of a vehicle who was towing another vehicle was "using" the towed vehicle. In *Dairyland Ins. Co. v. Drum,* 193 Colo. 519, 568 P.2d 459 (1977), Drum was towing Miller's disabled truck on the highway. Drum had an automobile policy with Colorado Farm Bureau, and Miller had one with Dairyland Insurance Company. During the tow, a third vehicle traveling down the highway ran into the towed truck. Both the Colorado Farm Bureau and Dairyland Insurance Company policies agreed to pay all sums which the insured "shall become legally obligated to pay because of bodily injury ... caused by accident and arising out of the ownership, maintenance, or use of the automobile." *Id.* at 460. The trial

court found that under the terms of the policies, "Miller (steering the towed vehicle) was using both his and Drum's towing vehicle; and Drum was using his own vehicle, but not Miller's." *Id.* at 461. The Supreme Court of Colorado, however, reversed, holding that both vehicles were being used by both Miller and Drum since, "[i]t is obvious that Drum's actions in towing the Miller vehicle carried the potential of creating an unreasonable risk of injury. That potential arose as much from Drum's use of Miller's vehicle as from the use of his own." *Id.* at 462.

[¶ 23]   Under this line of cases and our Court's adoption of the "causal connection" test for determining "arising out of the use" of a vehicle, Haskins, the insured, was "using" his tractor at the time of the accident. Therefore, we have the use of the tractor, which is an insured risk, and the use of the pickup, which is an excluded risk. It makes no difference, for coverage purposes, whether the negligent act occurs in the actual operation of the vehicle. There only need be a "causal connection." There is a "causal connection" between Haskins' tractor and Jones's injury because the accident was a result of Haskins' need to move the inoperable tractor to the side of the field. *See Pinson,* 984 F.2d at 614. The injury cannot be disassociated from the "use" of the tractor. The potential of creating an unreasonable risk of injury arose just as much from Haskins' tractor as it did from his pickup truck. *See Drum,* 568 P.2d at 462.

[¶ 24]   Several jurisdictions have addressed whether there is coverage under a policy in the situation where there is an excluded risk and a covered risk. These jurisdictions have concluded that if both the included and excluded risks contributed to the accident there is coverage. This is known as the concurrent cause doctrine.

[¶ 25]   In *Cawthon v. State Farm Fire & Cas. Co.,* 965 F.Supp. 1262 (W.D.Mo. 1997), the property owner was attempting to remove a tree limb that was embedded in the ground with a nylon rope that was tied to a trailer hitch of a pickup truck. As the owner drove his truck, the limb came loose, striking and killing his grandson. There was an automobile policy and a homeowners policy in effect. The automobile policy paid, but the homeowners policy had a provision excluding coverage for "bodily injury or property damage arising out of the ownership, maintenance, [or] use of a motor vehicle owned or operated by the insured." *Id.* at 1264. The United States District Court for the Western District of Missouri held that "the operation of the vehicle and the negligent plan for tying the ropes were, at most, concurrent causes of [the grandson's] death. The use of the truck was an antecedent, independent factor which contributed to [the grandson's] injuries." *Id.* at 1269. Therefore, the court held that the vehicle exclusion clause did not preclude coverage for the negligent planning and tying of the ropes. *Id.* at 1270.

[¶ 26]   In *Kalell v. Mut. Fire and Auto. Ins. Co.,* 471 N.W.2d 865 (Iowa 1991), after cutting two-thirds through a tree limb with a saw, Peterson attached a rope from the limb to a pickup truck. When the truck started to pull, the limb broke, hitting Kalell on the head. The homeowners policy contained an exclusion for occurrences "arising out of the use" of a motor vehicle. *Id.* at 866. Based on that exclusion, the homeowners insurance carrier asserted that its policy did not provide coverage. The district court held that the exclusion did not relieve the carrier from potential liability. The Supreme Court of Iowa affirmed, holding that "when two independent acts of negligence are alleged, one vehicle-related and one not vehicle-related, coverage is still provided under the home-

owners policy unless the vehicle-related negligence is the sole proximate cause of the injury." *Id.* at 868.

[¶ 27] In *Schlueter v. Grinnell Mut. Reinsurance Co.*, 553 N.W.2d 614 (Iowa Ct.App.1996), a farmer loaded a bale of hay onto a tractor; the tractor was then loaded onto a trailer which was hitched to a pickup truck. During transport, the hay bale fell off and was hit by a car. In addition to an automobile policy, there was a "Farm Guard I insurance policy" which excluded claims "arising out of the ownership, operation, maintenance, rental or use of . . . any motor vehicle by any insured person. . . ." *Id.* at 615. The Court of Appeals of Iowa held that "[a]lthough the accident here arose out of the use of a vehicle that is excluded under the policy, it also allegedly arose out of one or more concurrent nonvehicle-related acts," including the decision to load and secure the bale in the method chosen and the failure to immediately remove the hay bale once it fell off onto the road. *Id.* at 617. The court said that just because a motor vehicle was involved, the act of transporting the bale of hay did not cease to be farm-related. The court held that the policy exclusion did not preclude Grinnell's duty to defend its insured. *Id.*

[¶ 28] In *North Star Mut. Ins. Co. v. Johnson*, 352 N.W.2d 791 (Minn.Ct.App. 1984), a farm sprayer was bolted to the bed of a pickup truck. While the truck was being driven for non-farm purposes, the left arm of the sprayer extended and smashed into the windshield of a car traveling in the other direction. The driver of the truck had an automobile policy and a farm policy. The farm policy carrier, North Star, sought a declaratory judgment that its policy did not cover the accident because of a motor vehicle exclusion contained in the farm policy. The Court of Appeals of Minnesota held that the acci-

dent "allegedly resulted from two independent causes—[the driver's] negligence in operating the vehicle *and* in securing the sprayer arms to the unit. Since negligent maintenance and use of the sprayer is covered by the farm policy, North Star has a duty to defend, notwithstanding that the sprayer was attached to the pickup when the accident occurred." *Id.* at 794. The court held that "[t]he motor vehicle exclusion of the insured's farm policy does not exclude coverage for negligent maintenance of farm equipment solely because the equipment is attached to a motor vehicle." *Id.*

[¶ 29] In *Vang v. Vang*, 490 N.W.2d 647 (Minn.Ct.App.1992), while one brother was backing a truck into a barn, the other brother became pinned between the truck and a defective barn door. The truck involved in the accident was insured by an automobile policy. In addition, the brother driving the truck was a named insured on a farm policy. The farm policy excluded liability coverage for bodily injury "arising out of the ownership, negligent entrustment, maintenance, use, loading or unloading of . . . a motor vehicle owned or operated by . . . any insured while away from the insured premises." *Id.* at 649. The Court of Appeals of Minnesota held that the negligent failure to warn of the defective door was independent of the negligent driving of the truck and was not "inextricably linked with operation of a motor vehicle." *Id.* at 653. Therefore, the court found that the farm policy applied and the insurer had to indemnify its insured.

[¶ 30] Our Court in *Houser*, 389 N.W.2d at 631, held that there is "concurrent coverage under both an auto policy and a general liability policy where a vehicle-related act of negligence and a nonvehicle-related act of negligence are involved in the same accident." In *Houser*, our

Court cites to several Minnesota cases including *North Star Mut. Ins. Co. v. Johnson*, 352 N.W.2d 791. *Houser* was a wrongful death action which arose out of a two truck collision. 389 N.W.2d 626. A sugar beet truck deposited mud and dirt on a highway while hauling sugar beets. Later, a semi-truck traveling on that highway, because of the slippery conditions produced by the mud, lost control of the semi and collided with another semi-truck head on. The owner of the sugar beet truck was insured by two vehicle policies and one farm liability policy. The trial court found that the loss was caused by "both vehicle-related acts (use of the trucks to deposit dirt and mud on the highway) and nonvehicle-related acts (failure to remove the mud from the highway once deposited or to warn of the danger)." *Id.* at 628. The Court concluded that all three policies provided coverage stating, "[c]overage cannot be defeated simply because a separate excluded risk constitutes an additional cause of the injury." *Id.* at 631 (quoting *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal.3d 94, 109 Cal. Rptr. 811, 514 P.2d 123, 125 (1973)). The rationale of *Houser* supports the conclusion there is concurrent coverage under the facts of this case. It was the inoperable tractor that gave rise to the need to hitch the tractor up and to tow it. The negligent attachment of the tow rope to the hitch caused the accident.

[¶ 31] We recognize the application of the concurrent coverage doctrine has not been uniform among the various jurisdictions, but we do not find those cases contrary to our holding persuasive. *See North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452 (Iowa 1987) (subsequently distinguished by *Kalell*, 471 N.W.2d at 866, which explained that in *Holty*, the motor vehicle exclusion precluded coverage because the auger which caused the injury was an integral part of the motor vehicle,

whereas a rope is not); *Allstate Ins. Co. v. Jones*, 139 Cal.App.3d 271, 188 Cal.Rptr. 557 (1983) (no coverage for a claim of negligent loading, securing, and fastening of steel rebar to a pickup truck when the general liability policy specifically excluded damages arising out of loading and unloading of an automobile); *Columbia Mut. Cas. Ins. Co. v. Coger*, 35 Ark.App. 85, 811 S.W.2d 345 (1991) (no coverage for a claim of negligent loading and unloading of lumber on a lumber truck where the policy in question contained specific loading and unloading language in the exclusion); *Newton v. Nicholas*, 20 Kan.App.2d 335, 887 P.2d 1158 (1995) (no coverage for a claim of negligent loading and fastening of a water tank to a flatbed truck where the policy in question contained specific loading and unloading language in the exclusion); *State Farm Fire and Cas. Co. v. Huyghe*, 144 Mich.App. 341, 375 N.W.2d 442 (1985) (homeowners insurance policy did not provide coverage for injury caused by driving under a clothesline); *American States Ins. Co., Inc. v. Porterfield*, 844 S.W.2d 13 (Mo.Ct.App.1992) (no coverage found under a commercial general liability policy where the trailer that unhitched and collided with an oncoming vehicle was within the definition of "auto" and specifically excluded from coverage); *Northern Ins. Co. of New York v. Ekstrom*, 784 P.2d 320 (Colo.1989) (claim of negligent entrustment found to be excluded under a general liability policy); and *Heimerman v. Franklin Mut. Ins. Co.*, No 89–0495, 1989 WL 154479, 450 N.W.2d 255 (Wis.Ct.App. 1989) (holding that the selection of a truck and use of a truck were not separate activities).

[¶ 32] Because our Court has adopted the concurrent cause doctrine, the issue in the present case is whether the alleged negligent acts, the negligent choice of a nylon rope and the negligent attach-

ment of the tow rope, were independent factors which contributed to Jones's injury. *See Cawthon*, 965 F.Supp. at 1269; *see also Johnson*, 352 N.W.2d at 794. Since there were "motor vehicle"-related acts of negligence and non-"motor vehicle"-related acts of negligence both involved in the same accident, concurrent coverage under both the automobile policy and the farm policy exists. *See Houser*, 389 N.W.2d at 631.

[¶ 33] The Grinnell policy is a general liability policy for farm operations. The activities of hitching up a farm implement and towing a farm implement are activities within the risk the parties contemplated that there would be insurance for under the Grinnell Farm–Guard policy. Haskins' acts of hitching up and moving the tractor never ceased to be farm-related and independent just because a pickup was involved. *See Schlueter*, 553 N.W.2d at 617.

██ [¶ 34] Finally, the Center Personal Auto Policy provides:

OTHER INSURANCE

If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance.

[¶ 35] The Grinnell Farm–Guard Policy provides:

Other Insurance—Liability to the Public Coverage, Liability to Farm Employee Coverage and Medical Payments for Persons Named

This insurance is excess over any other valid and collectible insurance. However, if the other insurance is specifically written as excess insurance over this policy, the limits of this policy apply proportionately. We will pay the death benefit under Coverages D and E regardless of other insurance.

[¶ 36] We adhere to our decisions in *Houser* and *Transamerica* and conclude that "each insurer's coverage is direct and primary for the same loss," and each must share pro rata in paying the $25,000 settlement in the proportion that the separate limits of their respective coverages bear to the total of the limits of the two policies.[1] *Houser*, 389 N.W.2d at 631; *Transamerica*, 463 N.W.2d at 643–44. Accordingly, Grinnell is entitled to reimbursement from Center Mutual in an amount equal to Center Mutual's said pro rata share of the $25,000 paid to Jones plus interest at six percent from the date of the payment.

E

[¶ 37] Because Haskins first contacted Grinnell about the accident, Center attempts to invoke the doctrine of reasonable expectations to impose liability under Grinnell's policy. We do not need to reach this issue in light of our conclusion that Grinnell's policy provides coverage under these facts.

III

[¶ 38] Grinnell sought "reimburse[ment]" from Center for the amount of the settlement it made with Jones and its guaranty to the United States, and the

---

1. There are other approaches to determining the allocation of the loss where two or more policies provide primary coverage but include conflicting "other insurance" clauses. *See* Rowland H. Long, *The Law of Liability Insurance* § 22.04 (2003); Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 219:51 (3d ed.1999). However, because the parties in this case did not brief the issue, we are not inclined at this time to depart from the method of allocation applied in *Houser* and *Transamerica*.

trial court ruled Grinnell was entitled to be reimbursed under principles of indemnity. Center argues the trial court erred in allowing indemnity under the circumstances.

### A

[¶ 39] In its answer to the complaint, Center argued it has no obligation to reimburse Grinnell $25,000 for the payment it made to Jones because that payment was "voluntary."

[¶ 40] Indemnity is a remedy which permits a party to recover reimbursement from another for the discharge of a liability that, as between the two parties, should have been discharged by the other. *GeoStar Corp. v. Parkway Petroleum, Inc.*, 495 N.W.2d 61, 68 (N.D. 1993). A right of indemnity may arise by express agreement or by implication. *Mann v. Zabolotny*, 2000 ND 160, ¶ 8, 615 N.W.2d 526. Where, as here, there is no express contractual duty to indemnify another, indemnity nevertheless may be recovered if the evidence establishes an implied contract or if one party is exposed to liability by the action of another party who, in law or in equity, should make good the loss of the other. *Johnson v. Haugland*, 303 N.W.2d 533, 543 (N.D.1981). Indemnity is an equitable doctrine not amenable to hard and fast rules, and rather than using strict standards, courts must examine carefully both parties' conduct in light of general notions of justice. *Nelson v. Johnson*, 1999 ND 171, ¶ 20, 599 N.W.2d 246.

[¶ 41] Generally, an indemnitee who settles a claim before judgment must prove that it was not a volunteer, but was actually liable, in order to recover indemnity. *See* 42 C.J.S. *Indemnity* § 46 (1991); 41 Am.Jur.2d *Indemnity* § 46 (1995). An exception to the general rule was explained by the court in *Aetna Life &*

*Cas. Co. v. Ford Motor Co.*, 50 Cal.App.3d 49, 122 Cal.Rptr. 852, 854 (1975):

Equitable indemnity, like subrogation, is not available to a volunteer. It extends to those who pay in performance of a legal duty in order to protect their own rights or interests. (*Employers Etc. Ins. Co. v. Pac. Indem. Co.*, 167 Cal.App.2d 369, 334 P.2d 658.) However, one acting in good faith in making payment under a reasonable belief that it is necessary to his protection is entitled to indemnity, or subrogation, even though it develops that he in fact had no interest to protect. (*Employers, supra.*)

The rule allowing equitable indemnity for settlements if the indemnitee has a reasonable belief of potential liability serves "the public policy which favors settlement of litigation and could be viewed as a reasonable effort ... to mitigate damages in its claim against" the indemnitor. *Id.* at 855.

[¶ 42] The rule was further explained in *Phoenix Ins. Co. v. United States Fire Ins. Co.*, 189 Cal.App.3d 1511, 235 Cal.Rptr. 185, 193 (1987):

In an implied indemnity action, where defense of an action brought by the injured third party is tendered to the indemnitor and he refuses to defend, a good faith settlement by the indemnitee after such refusal is sufficient to establish that the damages were paid as a result of a legal obligation. (*People ex rel. Dept. Pub. Wks. v. Daly City Scavenger Co.* (1971) 19 Cal.App.3d 277, 282, [96 Cal.Rptr. 669].) The rule has also been stated as follows: "[Where] the indemnitee notifies the indemnitor of a pending claim and 'the indemnitor denies liability ... and refuses to assume the defense of the claim, then the indemnitee is in full charge of the matter and may make a good faith settlement without assuming the risk of being able to prove absolute legal liability or the actu-

al amount of the damage. (Citations.) A contrary rule would make the right to settle meaningless in cases where the indemnitor has denied liability.' [Citation.]" (*Pac. Tel. & Tel. Co. v. Pac. Gas & Elec. Co.* (1959) 170 Cal.App.2d 387, 392, [338 P.2d 984]; see also *Mabie & Mintz v. B & E Installers* (1972) 25 Cal.App.3d 491, 496, [101 Cal.Rptr. 919].)

*See also Hydro–Air Equip., Inc. v. Hyatt Corp.*, 852 F.2d 403, 407 (9th Cir.1988); *Illinois Tool Works Inc. v. Home Indem. Co.*, 24 F.Supp.2d 851, 854 (N.D.Ill.1998); *WestAmerica Mortgage Co. v. Tri–County Reports, Inc.*, 670 F.Supp. 819, 821 (N.D.Ill.1987); *Hudson Waterways Corp. v. Coastal Marine Serv., Inc.*, 436 F.Supp. 597, 603 (E.D.Tex.1977); *Compass Ins. Co. v. Cravens, Dargan and Co.*, 748 P.2d 724, 730 (Wyo.1988).

[¶ 43] Other courts have reached similar conclusions under principles of subrogation.[2] *See, e.g., Weir v. Federal Ins. Co.*, 811 F.2d 1387, 1395 n. 6 (10th Cir.1987), (the "liability of an insurer need not be ironclad in order for it to settle a claim without a subsequent finding that the payment to the insured was voluntary" because the "effect of preventing an insurer from bringing a subrogation action whenever an insurer reaches a settlement after initially challenging a claim would be to deter either settlements or investiga-

tions by insurers"); *Jorge v. Travelers Indem. Co.*, 947 F.Supp. 150, 156 (D.N.J. 1996) (holding volunteer status should be interpreted narrowly because "public policy favors the prompt payment of claims made by an insured against an insurer and disfavors assertion by an insurer of technical defenses to avoid liability on the policy"); *Aetna Cas. & Sur. Co. v. Katz*, 177 Ind.App. 44, 377 N.E.2d 678, 679 (1978) (holding "Aetna did not become a volunteer simply because the actual cause of the damage was not covered by its contract of insurance"); *American Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 110 N.M. 741, 799 P.2d 1113, 1117 (1990) (holding American General was not a volunteer, but was fulfilling its fiduciary obligations to the insured and was entitled to subrogation for a settlement because "Progressive's own inaction in failing to provide a defense forced American General to continue its representation, and it cannot now hide behind its own misdeeds to force American General to bear the burden of the defense."); *American Cont'l Ins. Co. v. PHICO Ins. Co.*, 132 N.C.App. 430, 512 S.E.2d 490, 495–96 (1999) (American was not a volunteer and was entitled to reimbursement because PHICO refused to defend and American would have been liable if the court had ruled PHICO's policy did not provide coverage); *State Farm Mut. Auto. Ins. Co. v. Northwestern Nat'l Ins. Co.*, 912 P.2d 983, 986 (Utah 1996) (State Farm

---

**2.** Subrogation is an equitable remedy available to secure the ultimate discharge of debt by a person who, in equity and good conscience, ought to pay that debt. *Farmers Livestock Exch. v. Ulmer*, 393 N.W.2d 65, 69 (N.D. 1986); *Morris v. Twichell*, 63 N.D. 747, 755, 249 N.W. 905, 908 (1933). The "doctrine of subrogation will be applied only in equitable discretion." *State Farm Mut. Auto. Ins. Co. v. Wee*, 196 N.W.2d 54, 60 (N.D.1971). "But this doctrine is always subject to the provision that it will not be applied where he who claims its benefit was a volunteer, a stranger, or an intermeddler, or where its application

will result in injustice to another." *Heegaard v. Kopka*, 55 N.D. 77, 81–82, 212 N.W. 440, 442 (1927). *See also Nelson v. Nelson*, 58 N.D. 134, 140, 226 N.W. 476, 477 (1929); *Beyer v. Investors' Syndicate*, 31 N.D. 247, 255–56, 153 N.W. 476, 478 (1915). Because indemnity and subrogation are similar equitable principles that overlap in some cases, *see Chenery v. Agri–Lines Corp.*, 115 Idaho 281, 766 P.2d 751, 754–55 (1988); Dan B. Dobbs, *Law of Remedies* § 4.3(4) (2d ed.1993), we believe the cases construing a volunteer in a subrogation context are helpful in this case.

was not a volunteer but had a legal interest to protect by investigating and settling a claim because a dispute existed over which policy covered the accident). *See also* 16 Lee R. Russ, *Couch on Insurance* §§ 223:25, 223:26 and 223:27 (3d ed.2000).

[¶ 44] In this case, Haskins first contacted Grinnell about the accident. Grinnell and Center disputed which of their policies covered the accident. Grinnell could have been held liable if the court ruled Center's policy did not cover the accident. Jones's injuries were substantial, and Grinnell had an opportunity to enter into an advantageous settlement of Jones's claim. Center refused to participate in settlement negotiations or to contribute to the settlement and simply denied that its policy applied. Center has not alleged that the settlement amount is unreasonable. Under these circumstances, we conclude Grinnell had a reasonable belief of potential liability and was not a volunteer.

B

[¶ 45] Center argues the trial court erred in ruling it must indemnify Grinnell for the guaranty it made to the United States to pay the $17,684 bill for medical services provided to Jones.

[¶ 46] Center first argues the court erred because, under the version of the Medical Care Recovery Act, 42 U.S.C. § 2651 *et seq.*, in effect at the time of the 1993 federal lawsuit, the United States could not recover directly from an insurance company no-fault insurance benefits for medical expenses. *See, e.g., United States v. Dairyland Ins. Co.*, 674 F.2d 750 (8th Cir.1982). Because the United States had no right to recover directly from Center, Center argues the United States should not be able to indirectly recover the medical expenses through this proceeding. Center's argument ignores that its insured, Haskins, was also a named defendant in the federal lawsuit, thereby triggering Center's duty to defend and indemnify Haskins in that case. *See generally Fetch v. Quam*, 2001 ND 48, ¶ 14, 623 N.W.2d 357. *Dairyland Ins. Co.* does not establish that Center could not have been liable to indemnify Haskins for Jones's medical expenses in the federal lawsuit.

[¶ 47] Center also argues indemnity on the guaranty is improper because Grinnell has not paid the money to the United States and did not enter into a formal written agreement to do so. Generally, "[a] cause of action for implied indemnity does not come into existence until the indemnitee has suffered actual loss through the payment of a judgment or settlement." 41 Am.Jur.2d *Indemnity* § 45 (1995) (footnote omitted). *See also Restatement of Restitution* § 77 (1937); 83 C.J.S. *Subrogation* § 19 (2000); Annot., *When statute of limitations commences to run against claim for contribution or indemnity based on tort*, 57 A.L.R.3d 867, 883–84 (1974). The concept of actual loss is further explained in 42 C.J.S. *Indemnity* § 44 (2000) (footnotes omitted):

[T]he right [to sue for indemnity] does not arise until the indemnitee has actually sustained or suffered loss; either through payment, settlement, or through the injured party's obtaining an enforceable judgment. However, it has also been held that [it] is not necessary that there be a judgment against a settling tort-feasor seeking indemnity.

An exception to the rule arises only where indemnification is asserted in a third-party action. So, a third-party indemnity claim may be filed before it accrues, in order to promote a settlement of all claims in one action. However, such claim cannot be determined before the underlying claim establishing liability and damages is determined.

This Court has recognized these general principles in the context of indemnity, *see. Conrad v. Suhr,* 274 N.W.2d 571, 575 (N.D.1979); *Jones v. Grady,* 66 N.D. 479, 488–89, 266 N.W. 889, 892–93 (1936), and subrogation. *See State Bank of Streeter v. Nester,* 385 N.W.2d 95, 98 (N.D.1986); *Weber v. United Hardware & Implement Mut. Co.,* 75 N.D. 581, 587, 31 N.W.2d 456, 459 (1948); *Rouse v. Zimmerman,* 55 N.D. 94, 99, 212 N.W. 515, 517 (1927).

[¶ 48] The requirement of actual loss through payment, settlement, or an enforceable judgment is well established. *See, e.g., States Steamship Co. v. American Smelting & Refining Co.,* 339 F.2d 66, 70 (9th Cir.1964) (a cause of action for indemnity does not accrue "until the indemnitee has made actual *payment* "); *American Sheet Metal, Inc. v. EM–KAY Eng'g Co., Inc.,* 478 F.Supp. 809, 814 (E.D.Cal.1979) (holding no indemnity could be claimed for an invoice that had been received by indemnitee but had not been paid); *Friedman v. Typhoon Air Conditioning Co.,* 205 F.Supp. 22, 24 (E.D.N.Y. 1962) (implied indemnity in favor of one who is legally liable for the negligence of another "covers loss or damage, not mere liability," and "until the judgment is actually paid there is no damage and no recovery"); *Christian v. County of Los Angeles,* 176 Cal.App.3d 466, 222 Cal.Rptr. 76, 78 (1986) ("[A] fundamental prerequisite to an action for partial or total equitable indemnity is an actual monetary loss through payment of a judgment or settlement."); *Flagship Nat'l Bank v. Gray Distrib. Sys., Inc.,* 485 So.2d 1336, 1342 (Fla.Ct.App. 1986) (indemnification of an indemnitee for "obligations" to a distributor was "premature" because there was no evidence of a judgment in favor of the distributor against the indemnitee); *Gibbons v. Nalco Chem. Co.,* 91 Ill.App.3d 917, 47 Ill.Dec. 472, 415 N.E.2d 477, 480 (1980) (a cause of action for indemnity did not accrue until judgment against indemnitee became final and was satisfied); *Leiker v. Gafford,* 249 Kan. 554, 819 P.2d 655, 658 (1991) ("Simply because one has been found liable for an obligation of another, it does not necessarily follow that one is entitled to indemnification" because a "condition precedent ... is that the indemnitee must actually have paid on the obligation for which he seeks indemnification"); *Hager v. Brewer Equip. Co.,* 17 N.C.App. 489, 195 S.E.2d 54, 57 (1973) ("it is almost universally held" that a right to indemnity does not accrue until indemnitee "has paid damages to the injured party"); *Perry v. Pioneer Wholesale Supply Co.,* 681 P.2d 214, 218 (Utah 1984) ("[A] cause of action for indemnity does not arise until the liability of the party seeking indemnity results in his damage, either through payment of a sum clearly owed or through the injured party's obtaining an enforceable judgment.").

[¶ 49] In this case, Grinnell has not paid the United States the $17,684 it guaranteed to pay for medical services provided for Jones. The record contains no judgment against Grinnell and in favor of the United States for those medical services or for enforcement of the guaranty. This is not a third-party action, and the United States is not a party in this case. The record reflects Grinnell and the United States originally contemplated that "a formal agreement needs to be drafted setting forth the terms of our understanding" about the guaranty, but no formal agreement was found. Grinnell's claim for indemnity rests only upon its June 10, 1993, letter to an assistant United States attorney, stating, "Grinnell Mutual will guarantee that the air force lien will be paid in full." We conclude this evidence does not establish that Grinnell suffered an actual loss entitling it to be indemnified for the $17,684 it guaranteed to pay to the United States. Consequently, we conclude the tri-

al court erred in ordering Center to indemnify Grinnell for the guaranty.

## IV

■ [¶ 50] Center argues the trial court erred in awarding Grinnell prejudgment interest under N.D.C.C. § 32–03–05 at the rate of six percent on its $25,000 settlement with Jones from May 22, 1991,[3] the date of the settlement.

■ [¶ 51] Section 32–03–05, N.D.C.C., gives a court the discretion to award prejudgment interest for the breach of an obligation not arising from contract. *Swain v. Harvest States Coop.*, 469 N.W.2d 571, 574 (N.D.1991). A trial court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, its decision is not the product of a rational mental process leading to a reasoned determination, or it misinterprets or misapplies the law. *Western Nat'l Mut. Ins. Co.*, 2002 ND 63, ¶ 31, 643 N.W.2d 4.

[¶ 52] Center argues interest should not have been awarded because Grinnell should not be able to profit from its delay in pursuing this action. We do not condone Grinnell's delay in pursuing its claim against Center, but Center's inaction cannot be ignored. Center refused to enter into settlement negotiations with Jones, refused to contribute to the settlement, and required Grinnell to commence this lawsuit to recover the payment. Center did nothing to move this lawsuit along, presumably because it was not the party that had paid the settlement amount. The equities do not favor Center in its argument that Grinnell should have moved more expeditiously in obtaining judgment against Center and requiring it to honor its contractual obligations to its insured.

[¶ 53] Six percent per annum is the legal rate of interest authorized under N.D.C.C. § 47–14–05. We conclude the trial court did not abuse its discretion in awarding Grinnell six percent interest; however, in accordance with our decision, Center owes the six percent interest only on its pro rata share of the $25,000. Because we have concluded the trial court erred in ordering Center to indemnify Grinnell for its guaranty to the United States, we need not determine whether the court erred in awarding prejudgment interest on the guaranty.

## V

[¶ 54] We affirm that part of the judgment ruling Center's automobile insurance policy provided coverage for the accident, but reverse that part of the judgment concluding Center must indemnify Grinnell for the full $25,000 plus interest for the Jones settlement. We hold Center must indemnify Grinnell for its pro rata share of the $25,000 plus six percent interest from the date of the settlement. We reverse that part of the judgment ordering Center to indemnify Grinnell $17,684 plus interest for its guaranty to the United States.

[¶ 55] WILLIAM A. NEUMANN, Acting C.J., CAROL RONNING KAPSNER, JJ., concur.

[¶ 56] The Honorable JAMES H. O'KEEFE, Surrogate Judge, participated in oral argument in place of VANDE WALLE, C.J., disqualified, but died January 17, 2003, and did not participate in this decision.

SANDSTROM, Justice, concurring in part and dissenting in part.

[¶ 57] I concur in Part I, Part II A, B and C, and Part III of the majority opin-

---

3. The parties agree that the date listed in the trial court's findings and conclusions, April 22, 1991, is a clerical error.

ion. I respectfully dissent from Part II D and E, Part IV, and Part V.

## I

[¶ 58] I would hold there is no basis for allocation of losses between Center and Grinnell because Grinnell's "Farm–Guard Policy" does not provide any coverage in this case. The liability section of Grinnell's "Farm–Guard Policy" obligates it to "pay subject to the liability limits and the terms of the policy all sums arising out of any one loss which an *insured person* becomes legally obligated to pay as damages because of *bodily injury* or *property damage* covered by this policy." Grinnell concedes this provision could provide coverage in this case, but argues an exclusion in its policy applies that takes this coverage away: "*We* will not pay for *bodily injury* or *property damage* arising out of the ownership, operation, maintenance, rental or use of . . . *any motor vehicle* by any insured person." The majority, at ¶ 20, misanalyzes this exclusion by engaging in a logical fallacy:

> The language of the policy is unambiguous. It does exclude liability arising out of the use of the pickup. However, it is equally as clear that it does not exclude liability arising out of "the ownership, operation, maintenance, rental or use of" a farm implement. The next logical question is whether the insured, Haskins, was using a farm implement, the tractor, at the time of the accident. Liability arising out of the use of a farm implement in the context of this case is a covered risk. Haskins was "using" the tractor within the meaning of the policy and there is coverage.

The majority concedes that the policy excludes liability arising from the use of the pickup. The policy explicitly states the exclusion. But then the majority claims, "However, it is equally as clear that it does

not exclude liability arising out of 'the ownership, operation, maintenance, rental or use of' a farm implement." *Id.* The majority's statement is misleading in a number of ways. The policy contains no such statement, despite the majority's use of quotation marks. It is not "equally clear" when it is not stated. Further, the majority uses the phrase "does not exclude" but proceeds to treat that phrase as the equivalent of "includes." The policy does not state that it "includes liability arising out of the ownership, operation, maintenance, rental or use of a farm implement." Contrary to the implication of the majority, this is not a policy that both explicitly includes all liability arising out of the use of a farm implement and excludes all liability arising out of the use of a motor vehicle such as the pickup. The policy would provide liability coverage in general except that it excludes all liability arising out of the use of a motor vehicle as defined by the policy.

[¶ 59] The logical fallacy of the majority is similar to this: North Dakota law excludes all incarcerated felons from voting. North Dakota law does not exclude persons over 18 years of age from voting. Therefore, under the majority's logic, an incarcerated felon over 18 years of age is eligible to vote because persons over 18 years of age are not excluded from voting.

[¶ 60] Here the policy excluded an accident arising from the use of "*any* motor vehicle." The "motor vehicle" in use, which triggers the exclusion, is not the tractor that was being towed, but the pickup truck that was doing the towing. Liability here is unambiguously excluded.

## II

[¶ 61] The majority next proceeds into analysis of concurrent coverage.

[¶ 62] Concurrent coverage under both an automobile policy and a general liability

policy exists when a vehicle-related act of negligence and a nonvehicle-related act of negligence are involved in the same accident. *Houser v. Gilbert*, 389 N.W.2d 626, 631 (N.D.1986). A general liability policy will apply only if the liability of the insured exists independently of any "use" of the insured's vehicle. *See, e.g., Columbia Mut. Cas. Ins. Co. v. Coger*, 35 Ark.App. 85, 811 S.W.2d 345, 347 (1991); *Allstate Ins. Co. v. Jones*, 139 Cal.App.3d 271, 188 Cal.Rptr. 557, 561 (1983); *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 455 (Iowa 1987). *Newton v. Nicholas*, 20 Kan. App.2d 335, 887 P.2d 1158, 1165 (1995); *State Farm Fire and Cas. Co. v. Huyghe*, 144 Mich.App. 341, 375 N.W.2d 442, 444 (1985); *American States Ins. Co. v. Porterfield*, 844 S.W.2d 13, 16 (Mo.Ct.App. 1992). For example, in *Coger*, 811 S.W.2d at 346, a truck owned by a lumber company and operated by its employees was delivering lumber when part of the load fell off the truck, landed on the highway, and collided with a van. The lumber company had a general liability policy with an automobile exclusion similar to the one in this case. *Id.* The trial court had ruled the exclusion did not apply because negligence was alleged in the maintenance of the straps used to secure the load and in securing the load. *Id.* The appellate court reversed, concluding "whether or not the lumber briefly came to rest before being struck by the van, and whether the negligent act was the operation of the vehicle, the securing of the load, or the maintenance of the straps securing the load, the injury and damage clearly arose out of the ownership, maintenance, or use of the truck or attached equipment and was therefore not covered by the policy." *Id.* at 347.

[¶ 63] In *Jones*, 188 Cal.Rptr. at 558, the insured owned a pickup truck that was equipped with an open-ended, overhead steel rack used to store and transport rebar. The truck collided with another vehicle, and as a result of the impact and improper storage of the load of rebar, the rebar struck the driver of the other vehicle, killing him. *Id.* at 559. The insured had a general liability policy with an automobile exclusion similar to the one in this case. *Id.* The court rejected the argument that the exclusion did not apply because there was non-auto-related independent negligence in inspecting, supervising, loading, securing, and fastening the rebar to the rack on the truck:

> [W]e have no alternative but to conclude that both of the acts of negligence which occurred to cause the death of Mr. Jones were auto-related. Defendants contend that we cannot so conclude because the parties stipulated that the first act of negligence was the failure of Alberts to properly "load, secure, fasten, supervise and inspect the rebar." Yet this argument ignores the obvious. Alberts' failure to inspect, etc. would not have been negligent were it not for his use of the truck. The stipulated failure to "load, secure, fasten, supervise and inspect the rebar" in a non-negligent manner, implicitly refers to the failure to do so *on the truck.*

*Id.* at 561.

[¶ 64] In *Holty*, 402 N.W.2d at 453, a farmer was driving his truck when an auger, attached to the truck's left side, came loose and extended across the center line of the road, injuring a person in an oncoming vehicle. The farmer had a farm liability policy with an automobile exclusion similar to the one in this case. *Id.* The court ruled the farm liability policy did not provide coverage because "the accident cannot be properly characterized as nonvehicle-related and caused solely by the auger." *Id.* at 455. The court noted, not only did the "truck, box and auger constitute one motorized vehicle," but "[i]f Holty is liable

it is not for a general failure to adequately tie down the auger; that act could not render him liable without his use of the vehicle on a public road," and "the movement of the auger depended on the truck's movement and velocity to become a hazard." *Id.*

[¶ 65] In *Huyghe*, 375 N.W.2d at 443, a woman was injured when she was struck in the back of the head by a cleat attached to the insured's house to secure a clothesline between the house and garage. The cleat was pulled free when the insured hit the clothesline while driving his pickup truck under the clothesline. *Id.* The woman alleged the insured had negligently maintained the premises and negligently located and installed the clothesline and cleat because the insured regularly drove his truck under the clothesline between the house and garage. *Id.* The court concluded a similar automobile exclusion to the insured's homeowner's policy precluded coverage because "[a]ny risk created by the location or the installation of the clothesline and cleat was the result of the truck's being driven in that area," and therefore, "the non-auto-related negligence is connected to the use of a motor vehicle." *Id.* at 444.

[¶ 66] In *Porterfield*, 844 S.W.2d at 14, an employee of the insured was driving a truck that was pulling a trailer carrying a small tractor when the trailer became unhitched and collided with another vehicle. The court rejected the argument that a similar automobile exclusion to the insured's general liability policy did not apply because the insured was negligent in the supervision of his employees in the proper method of hitching the trailer to the truck. *Id.* at 15. The court concluded the "injuries arose out of the use of the truck and not from negligent supervision and therefore there is no coverage for any injuries arising out of the automobile accident." *Id.* at 16.

[¶ 67] In *Newton*, 887 P.2d at 1159, several vehicle passengers were injured when they were struck by a 500–gallon water tank that had fallen from a flatbed truck driven and owned by the insured. The insured attached the tank to the truck by using a logging chain, the principal use of the truck was to haul water, and the tank was attached to the truck "75% or more of the time." *Id.* at 1160. The plaintiff alleged the collision was caused solely by the insured's "nonvehicle-related acts of negligence and carelessness in failing to tie down or secure the water tank." *Id.* The insured's homeowner's liability insurer argued its policy did not provide coverage because of a similar automobile exclusion, and the court agreed:

> There is no question that the activity in the present case involved the direct use of a motor vehicle. The negligence which occurred in this case by hauling a water tank that had not been properly inspected or secured to the truck bed does not exist independent of the ownership, maintenance, use, and loading and unloading of the vehicle. The injury occurred in this case because the water tank was being negligently hauled by a motor vehicle, and Nicholas' negligent actions in failing to inspect the apparatus holding the tank to the truck bed and his failure to properly secure it in the first place were directly connected to the transportation of the tank and do not exist independently from the use of the truck.... [T]he failure to inspect and properly secure the tank implicitly and logically refers to the failure to do so *on the truck.*
>
> In the present case, every act which occurred leading to the claimants' injuries was directly connected with the hauling of the water tank by use of a

motor vehicle, an event excluded by the policy provision at issue. *Id.* at 1165.

[¶ 68] In *Heimerman v. Franklin Mut. Ins. Co.,* No. 89–0495, 1989 WL 154479, 450 N.W.2d 255 (Wis.Ct.App.1989) (Unpublished), a pickup truck owned by the insured was towing a bale thrower wagon when the truck and wagon were involved in a collision with another vehicle. The owner of the pickup truck had a farmowner's policy with an automobile exclusion similar to the one in this case. A hearing examiner (the insurer was undergoing liquidation) ruled there was no coverage, concluding "the accident resulted from the ownership and use of a motorized vehicle as defined by the policy and would not have occurred absent negligent operation of the motorized vehicle." *Id.* at *1. The appellate court affirmed and rejected the argument that the policy should be interpreted to provide coverage because it did not specifically exclude coverage for the towing of a farm implement:

> [The policy] excludes coverage for liability resulting from the use of a motorized vehicle. The accident occurred due to the use of a motorized vehicle which was towing a nonmotorized vehicle. The policy cannot be read to cover the towing of the baler wagon merely because the insurer did not list specifically the countless uses of a motorized vehicle.

*Id.* at *2.

[¶ 69] Application of the concurrent coverage doctrine has not been uniform among the various jurisdictions, not even among the appellate courts in particular jurisdictions. *See* Annot., *Construction and effect of provision excluding liability for automobile-related injuries or damage from coverage of homeowner's or personal liability policy,* 6 A.L.R.4th 555 (1981). I agree, however, that because liability insurance is written for a specific hazard to enable the underwriter to calculate premiums on an equitable and predictable basis, "[t]he coverage under [an] automobile policy is ... 'dovetailed' into the exclusion under [a] comprehensive policy to provide for uniform, non-duplicative liability coverage." *Northern Ins. Co. of New York v. Ekstrom,* 784 P.2d 320, 324 (Colo.1989). Consequently, whenever possible, "[t]he coverage provision in an automobile liability policy and an exclusionary clause in a general liability policy should therefore be construed the same." *Id.*

[¶ 70] The majority's reliance on the fact situation in *Houser,* 389 N.W.2d at 630, to support concurrent coverage in this case is unpersuasive, because in *Houser* the farm liability insurer "concede[d] that it is liable under the general farm coverage for the loss caused by the failure to remove the mud and the failure to warn" subsequent to the use of the truck. Under the undisputed facts of this case, I believe Haskins' alleged negligence in hooking up the rope was inextricably intertwined with his "use" of the pickup to tow the tractor and cannot be considered a nonvehicle-related act of negligence. Because Jones's injuries arose from the use of Haskins' pickup, the exclusion applies. There is an exception to this exclusion relating to farm employees, but there is no evidence that Jones was Haskins' employee, gratuitous or otherwise. *See Center Mut. Ins. Co. v. Thompson,* 2000 ND 192, ¶ 16, 618 N.W.2d 505 (defining employee for purposes of insurance policy as a person who works for another in exchange for compensation). Consequently, I would hold Grinnell's policy does not provide any coverage in this case, and there is no basis for allocation of losses between Center and Grinnell.

[¶ 71] I would also reject Center's attempt to invoke the doctrine of reasonable expectations to impose liability under Grinnell's policy. The doctrine of reasonable

expectations has not been adopted by a majority of this Court. *See, e.g., Thompson*, 2000 ND 192, ¶ 12, 618 N.W.2d 505. Moreover, the doctrine is merely an interpretive tool in the construction of ambiguous insurance contracts, *RLI Ins. Co. v. Heling*, 520 N.W.2d 849, 854–55 (N.D. 1994), and Center has not shown any ambiguity in the Grinnell policy requiring resort to the use of the doctrine. *See Medd v. Fonder*, 543 N.W.2d 483, 487 (N.D.1996). Even if a majority of this Court were to adopt the doctrine of reasonable expectations, the doctrine cannot create coverage that unambiguously does not exist under Grinnell's policy.

## III

[¶ 72]  I would hold the trial court correctly ruled Center's automobile policy provided the sole coverage for Jones's injuries in this case, and would affirm the trial court's award of six percent interest to Grinnell on its $25,000 settlement with Jones from the date of the settlement.

[¶ 73]  Dale Sandstrom