**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 16, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

EUGENE GALLEGOS, DIANE
GALLEGOS,

        Plaintiffs - Appellants,

v.

SAFECO INSURANCE COMPANY
OF AMERICA,

        Defendant - Appellee.

No. 15-1238
(D.C. No. 1:14-CV-01114-WJM-MJW)
D. Colorado

**ORDER AND JUDGMENT**[*]

Before **GORSUCH**, **MURPHY**, and **McHUGH**, Circuit Judges.

# I. INTRODUCTION

A home owned by Eugene and Diane Gallegos suffered a partial roof

collapse, caused, at least in part, by the accumulated weight of ice and snow. The

Gallegoses sought coverage under a homeowners insurance policy issued to them

by Safeco Insurance Co. ("Safeco"). Safeco denied the Gallegoses' request for

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

insurance benefits, asserting the collapse was caused, at least in part, by improper maintenance and construction. The Gallegoses brought state law claims against Safeco, asserting the denial of insurance benefits was improper and in bad faith. The district court granted summary judgment to Safeco, ruling (1) it was undisputed improper maintenance contributed to the roof collapse; (2) Safeco preserved its right to rely on the improper-maintenance exclusion by raising the issue in its reservation of rights letter; and (3) Safeco did not waive its coverage defenses when, in the midst of the litigation, it paid to the Gallegoses the amounts they expended to repair the roof. The Gallegoses appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the district court's grant of summary judgment in favor of Safeco.

## II. BACKGROUND

Safeco issued a homeowners insurance policy to the Gallegoses, effective November 15, 2013 to November 15, 2014, for a home located in Colorado. Sometime in late November or early December 2013, a storm deposited snow on the roof of the Gallegoses' residence. On December 9, 2013, they submitted a claim to Safeco, reporting that the weight of ice and snow caused the roof to sag and the living room ceiling to crack. Safeco retained Corey Schrauben, a professional engineer, to inspect the loss. Schrauben concluded the damage to the Gallegoses' roof resulted not from the accumulation of ice and snow from a

storm, but from poor roof construction/repair and historic gravity-loading events that predated the Gallegoses' ownership of the home.[1]

On January 14, 2014, Safeco sent a letter to the Gallegoses denying their claim. That letter specifically noted as follows:

> As you are aware, this claim arises from damage to your roof from the weight of ice and snow. Our investigation revealed that your roof sustained damage from historic gravity-loading events on your roof that occurred before the home was purchased. There is no evidence that shows this damage occurred since the home was purchased in 1999. Also, the sags in the ceiling's drywall in the living room is due to a fastener installation pattern that is insufficient to support the weight of the drywall. Also, the moisture damage to the drywall is long term, which produced a punching shear failure of the fasteners.

The letter moved on to identify multiple exclusions in the policy that were relevant to the coverage determination.[2] Finally, the denial letter stated that

---

[1]Schrauben's report observed the following conditions: "historic moisture intrusion" into the attic; roof rafters spaced at "32-inches on center and knee braces were visibly shifted"; and "historic repairs in the form of improvised 1x knee braces to ceiling joists and sistered 2x4 rafters." Based upon his inspection of the home, examination of records at the county assessor's office and historical weather data, and his professional engineering experience, Schrauben concluded: the "roof structure exhibited no damage that was consistent with a snow-loading event that has occurred since" the Gallegoses' 1999 purchase of the home; "fractures in the roof framing were consistent with historic gravity-loading events inclusive of dead loads, snow loads, and other live loads on the roof (such as construction loads) that occurred prior to" the Gallegoses' purchase of the residence; and "sags in the ceiling sheetrock of the living room were consistent with a fastener installation pattern that was insufficient to support the weight of the sheetrock and/or a long-term, moisture-related deterioration of the sheetrock, which produced a punching shear failure of the fasteners."

[2]The relevant provisions of the insurance policy identified in the denial
(continued...)

Safeco "reserves any and all rights and defenses allowed under the policy of

insurance and the law. No action taken by [Safeco], its employees and/or agents,

---

[2](...continued)
letter are as follows:

> We do not cover loss caused directly or indirectly by any of the following excluded perils. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area;

> 5. continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years.

> 6. a. wear and tear, marring, scratching, deterioration; b. inherent defect, mechanical breakdown; c. smog, rust or other corrosion, or electrolysis; d. smoke from agricultural smudging or industrial operations; e. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs, ceilings, swimming pools, hot tubs, spas, or chimneys; f. birds, vermin, rodents, insects or domestic animals; g. pressure from or presence of plant roots.

> . . . .

> 17. Weather that contributes in any way with a cause or event not covered in this section to produce a loss. However, any ensuing loss caused by a covered peril and not otherwise excluded is covered.

> 18. Planning, Construction or Maintenance, meaning faulty, inadequate or defective: a. planning, zoning, development, surveying, siting; b. design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; c. materials used in repair, construction, renovation or remodeling; or d. maintenance of property whether on or off the *insured location* by any person or organization. However, any ensuing loss not excluded is covered.

is intended to be or should be considered to be a waiver of any of these rights or defenses under the policy of insurance or the law."

The Gallegoses filed suit. In a pre-trial scheduling order, the Gallegoses claimed the cost to repair the damage was $9782. Safeco paid $9782 to Gallegos in the midst of the litigation.

The Gallegoses retained a professional engineer, Scott Johnson, who issued a report, dated November 20, 2014, which contains the following opinions:

> The section of the roof that sagged was not well supported. Although the framing system has lasted without a major failure over the span of years that Mr. Gallegos has resided there, it was never in a condition that was strong enough to be able to support the heavy snow loading typical for that site. . . .
>
> . . . .
>
> On page 71 through 73 of my deposition I estimated the amount of weight I thought the roof would be able to handle without causing damage to the ceiling. My estimation at the time was 20-30 pounds per square foot (psf). I have since performed additional calculations . . . . These calculations show that I overestimated the loading the roof was capable of supporting. Upon review of these calculations, and the condition of the wood and framing I now feel that the amount of snow loading the roof is capable of carrying without causing the ceiling joist to sag further is roughly 6-8 pounds per square foot. This translates to roughly 11-15 inches of snow at 10% snow water equivalent (SWE). This total is consistent with our original report and our conclusion that enough snow and ice had accumulated to cause the deflection in the roof and ceiling.

In his deposition, Johnson confirmed his opinions regarding the cause of the damage to the property and agreed with Schrauben regarding the construction deficiencies in the roofing system:

-5-

Q. The next sentence says, "Roof rafters were spaced at 32 inches on center and knee braces were visibly shifted." Do you agree with that statement?

A. I do.

Q. Okay. The next sentence says, "Given the wider rafter spacing and absence of bracing at the rafter mid-span, larger deflections would necessarily be expected."

A. I agree with that also.

. . . .

Q. And then skipping down—skipping the next sentence and starting with "Coincident with the aforementioned fractures, historic repairs in the form of improvised 1-by knee braces to ceiling joists and sistered 2-by-4 rafters were observed." Did you observe similar construction?

A. I did observe some rather interesting carpentry.

Finally, Johnson opined that the construction deficiencies and deterioration of the roof, combined with ice loading, caused the roof and ceiling to sag:

A. It's ice loading that caused the problem, number one. Number two, the braces that were out of place were—if you believe that Mr. Gallegos didn't make any modifications—were already there when he bought the property, they may have already been out of place when he bought the property, but that still wouldn't have stopped them from transmitting force from the roof downward.

And, as I said, that roof, in my opinion, without going into forensics and stuff like that, was just not a very—the wood was damaged or deteriorated, however you want to put it. The wood wasn't as good as it could be. And, therefore, it would—it wouldn't take as much of a load to cause trouble for that roof as if it was a brand-new roof, I don't think I'd argue at all about the spacing being excessive on the rafters and the joists.

The district court granted summary judgment in favor of Safeco, concluding it was undisputed that improper maintenance/construction of the roof supports contributed to the collapse of the Gallegoses' roof. In particular, the district court ruled the insurance policy contained an "anti-concurrent causation" clause that significantly limits Safeco's liability. That provision states that the policy does "not cover loss caused directly or indirectly by any of [the specifically excluded perils]. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss."[3] Based on the opinion offered by Johnson, the district court concluded no reasonable jury could conclude that improper maintenance and/or construction of the roof was not a cause, at least in part, of the roof collapse. The district court rejected the Gallegoses' claim that Safeco had waived reliance on the relevant policy exclusions by either (1) failing to identify them in the January 14, 2014, letter denying the claim, or (2) paying the costs of the roof repair in the midst of the litigation. The Gallegoses appeal.

---

[3]Anti-concurrent causation clauses are enforceable under Colorado law. *See Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 842 (Colo. App. 2008).

## III. ANALYSIS

### A.  Standard of Review

This court reviews a grant of summary judgment de novo, applying the same legal standard used by the district court.  *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1124 (10th Cir. 2000).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If there exist no genuine disputes of material fact, this court must determine if the district court correctly applied the law.  *See Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

### B.  Discussion[4]

#### 1.  Coverage

Although the Gallegoses attempt to make it complicated, the issue on appeal is quite simple.  The question is whether any reasonable juror could conclude that a specifically excluded cause (i.e., improper construction and/or

---

[4]In resolving this appeal, we do not consider issues not raised before the district court or issues only alluded to in a perfunctory manner in the Gallegoses' appellate briefs.  *See United States v. Windrix*, 405 F.3d 1146, 1156 (10th Cir. 2005) (declining to address an issue the party "did not argue in district court," because "in general we will not consider an argument not raised below," and the party did "not argue on appeal that any special circumstance requires us to address this contention despite lack of preservation below"); *Femedeer v. Haun*, 227 F.3d 1244, 1255 (10th Cir. 2000) ("On appeal . . . parties must do more than offer vague and unexplained complaints of error.  Perfunctory complaints that fail to frame and develop an issue are not sufficient to invoke appellate review." (quotation and alterations omitted)).

maintenance) did not contribute to the collapse of the Gallegoses' roof. Like the district court, this court concludes that the answer to that question is an emphatic "no."

The insurance policy at issue in this case contains multiple exclusions for wear and tear; deterioration; and faulty design, construction, repair, and maintenance. Johnson, the Gallegoses' own engineering expert, confirmed in his report that excluded events contributed to the loss. He opined that two factors caused the roof collapse. The first was "ice loading." The second was the deteriorated condition of the framing supporting the roof and the faulty, inadequate, or defective design, construction, and repair of the roof's framing. In his deposition, Johnson identified several deficiencies in the framing of the roofing system to explain why the roof "deflected" under the relatively modest amount of snowfall reported during the relevant storm. These deficiencies included: (1) faulty design, construction, repairs, and maintenance; (2) shrinking and cracking of the framing; (3) presence of water over a period of years; and (4) general wear and tear and deterioration. According to Johnson, these factors, all of which are excluded under the terms of the policy, combined with the weight of ice and snow from the storm to cause the roof to collapse. Accordingly, by the Gallegoses' expert's own admissions, weather was only one contributing factor to the loss which combined with other, excluded events, to cause the collapse. That

being the case, no reasonable juror could conclude improper construction and/or maintenance of the roof did not, at least in part, contribute to the roof's collapse.

The Gallegoses argue, without any factual or legal support, that Safeco cannot rely upon the wear and tear exclusion because there is no evidence of "abnormal" wear and tear. The exclusion is not, however, limited to "abnormal wear and tear," but rather encompasses all "wear and tear." *See Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 902 (10th Cir. 2006) (applying Colorado law and holding that when the language used in an insurance contract is plain and its meaning is clear, the agreement must be enforced as written). The policy at issue here unambiguously excludes losses caused, "directly or indirectly," by "wear and tear, marring, scratching, deterioration." Furthermore, the Gallegoses have not identified a single piece of evidence in the record upon which a juror could conclude the maintenance/construction defects identified by Johnson amount to nothing more than "normal" wear and tear.

## 2. Reservation of Rights

Colorado law provides that an insurer must raise or reserve all defenses known to it within a reasonable time or those defenses may be waived or the insurer may be estopped from asserting them. *U.S. Fidelity & Guar. Co. v. Budget Rent–A–Car Sys., Inc.*, 842 P.2d 208, 210 n.3 (Colo. 1992). When an insurer denies coverage on a specific ground it waives the right to later assert additional defenses to coverage. *Flatiron Paving Co. v. Great Sw. Fire Ins. Co.*,

812 P.2d 668, 671 (Colo. App. 1990) (holding unaffected by *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 148 n.10 (Colo. 2007)). "[W]hile an insurer may be estopped by its conduct or its knowledge from insisting upon a forfeiture of a policy, the coverage, or restrictions on coverage, cannot be extended by the doctrine of waiver or estoppel." *Hartford Live Stock Ins. Co. v. Phillips*, 372 P.2d 740, 742 (Colo. 1962).

The Gallegoses assert that the January 14, 2014, letter from Safeco denying coverage for the roof collapse did not raise the defenses to coverage asserted by Safeco in this litigation. Thus, they claim Safeco has waived the right to rely on those defenses. In particular, the Gallegoses argue that Safeco denied their claim due to long-term moisture damage and improper maintenance, but seeks to exclude coverage in this litigation because of improper construction and/or maintenance. The Gallegoses' arguments in this regard fail for two primary reasons.

This court concludes the denial-of-coverage letter sufficiently raised and/or reserved each of the exemptions to coverage relied upon by Safeco in this case. While the denial letter certainly does cite moisture damage and "historic gravity-loading events" that occurred prior to the Gallegoses' purchase of the home as bases for denying the claim, the letter also specifically stated that "damage due to improper maintenance" is excluded from coverage. Furthermore, the letter

-11-

contained language describing specific exclusions,[5] including wear and tear; deterioration; weather; and faulty construction, design, or maintenance that were particularly applicable to the denial of the Gallegoses' claim. That being the case, this court concludes the denial letter preserved all relevant grounds for denial of coverage put forward by Safeco in this case.

Even if Safeco's denial-of-coverage letter had not properly preserved the relevant exclusions from coverage by specifically identifying them, that failure would not estop Safeco from relying on the exclusions in this case. The decision of the Colorado Supreme Court in *Hartford Live Stock* makes clear that while an insurer can waive a defense that amounts to a "forfeiture of a policy," coverage and exclusion issues are not subject to waiver. *Id.* at 742. It is uncontested that Safeco's defenses to the Gallegoses' coverage claim in the instant litigation depend entirely on exclusions which define the parameters of coverage provided by the insurance policy. That being the case, *Hartford Live Stock* makes clear the issues are not subject to waiver.

The district court correctly concluded that Safeco preserved in its denial-of-coverage letter its ability to rely on exclusions from coverage set out in the

---

[5]That is, the denial-of-coverage letter did not recite a list of all exclusions from coverage contained in the insurance policy. Instead, it listed only some of the exclusions. It is those specific exclusions that were identified in the letter that form the basis for Safeco's arguments regarding coverage in the instant litigation.

insurance policy.  In any event, coverage exclusions are not subject to waiver or estoppel in the manner asserted by the Gallegoses.

### 3.  Payment of Claim

The Gallegoses assert that Safeco's voluntary payment of the repair costs for the roof, in the midst of the litigation, serves as a waiver of Safeco's right to rely on coverage exclusions set out in the insurance contract.  The law in Colorado is clear, however, that "a waiver 'cannot have created liability where none existed under the policy.'"  *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 620 (Colo. 1999) (quoting *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1198 (Colo. 1988)); *see also Hartford Live Stock Ins. Co.*, 372 P.2d at 742 ("[T]he doctrine of waiver cannot be invoked to create a primary liability and bring within the coverage of the policy risks not included or contemplated by its terms.").

*Rudnick v. Ferguson*, 179 P.3d 26 (Colo. App. 2007) is not to the contrary. In *Rudnick*, a Colorado statute capped available damages against the defendants at $150,000.  *Id.* at 29.  Before trial, the defendants deposited $150,000 with the court registry and, thereafter, the trial court dismissed the case as moot.  *Id.* at 30. *Rudnick* held that "the trial court did not err in permitting the [defendants] to tender $150,000 into the court registry and in dismissing the case as moot without requiring the [defendants] to confess judgment, to admit their liability, or to enter into a settlement with the [plaintiffs]."  *Id.* at 31.

The Gallegoses contend *Rudnick* stands for the proposition that because Safeco paid them directly, rather than depositing funds into the district court registry pursuant to Fed. R. Civ. P. 67, Safeco has confessed liability. This reading of *Rudnick* is untenable and stretches the case well beyond its context. Contrary to the Gallegoses' assertions, *Rudnick* simply stands for the proposition that when a defendant has paid to the plaintiff the maximum amount the plaintiff could recover, the case is properly dismissed as moot. The rule set out in *Rudnick* has no relevance to this case.

The district court correctly ruled that the payment by Safeco to the Gallegoses for roof-repair costs did not constitute a waiver of the coverage exclusions set out in the insurance policy.

## IV.  CONCLUSION

For those reasons set out above, the order of the district court granting summary judgment in favor of Safeco is hereby **AFFIRMED**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge